**Janice STEWART, Plaintiff,**

v.

**CITY OF PONTOTOC, MISSISSIPPI, et al., Defendants.**

**No. WC 75–87–K.**

United States District Court, N. D. Mississippi, W. D.

Aug. 16, 1978.

---

## MEMORANDUM OPINION

KEADY, Chief Judge.

This employment discrimination suit based upon statutory and constitutional prohibitions thereof presents a serious challenge to this court's jurisdiction under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Since the resolution of this issue necessitates an understanding of the procedural history of the litigation, we direct our initial attention thereto.

### I. PROCEDURAL HISTORY

On October 16, 1975,[1] the plaintiff filed an employment discrimination suit naming as defendants the City of Pontotoc, Mississippi, its Mayor, Howard Stafford, and Aldermen Charles Cummins, Lamar Roberts, Sr., Claude H. Owen, and Doyle Turner, as well as City Clerk Wright Haddox, charging that defendants had pursued policies and practices having the purpose and effect of denying blacks equal employment opportunities within the City Clerk's office. The case was begun as a class action on behalf of the named plaintiff and all other blacks who had applied for employment but were not hired by the Pontotoc City Clerk's office, as well as all blacks who had been dissuaded or deterred from applying for such employment because of defendants' denial of equal employment opportunities. Plaintiff invoked federal court jurisdiction under 28 U.S.C. § 1343(3), (4), alleging causes of action based on 42 U.S.C. §§ 1981 and 1983; plaintiff also asserted jurisdiction under Title VII. Plaintiff sought injunctive relief, actual and compensatory damages, and attorney fees, for the benefit of the class members.

On November 5, 1975, defendants filed their responsive pleading challenging the court's jurisdiction under Title VII because of plaintiff's failure to invoke jurisdictional prerequisites essential to maintain an action

Charles Victor McTeer, Greenville, Miss., for plaintiff.

William L. Sneed, Pontotoc, Miss., William A. Allain, Jackson, Miss., for defendants.

1. On March 25, 1978, plaintiff married a Mr. Smith, but will be referred to here by her maiden name. Plaintiff and her husband, who is employed by Civics Communication Center, presently reside at Baimbridge, Maryland, a suburb of Washington, D. C. Plaintiff, since the fall of 1977, has been enrolled as a law student at Howard University.

thereunder, denying that the suit was properly maintainable as a class action, and, in answering the factual allegations, denied that the defendants, or any of them, had maintained a racially discriminatory policy against hiring blacks within the several municipal departments, including the City Clerk's office.

After extensive discovery, plaintiff, on February 2, 1977, was granted 60 days additional time in support of her motion to have the action certified as a class action. On March 11, 1977, plaintiff moved to amend her complaint, alleging, among other things, that "the amended complaint does not differ substantially from the original complaint save the deletion of certain provisions regarding class claims." Three days later, the court granted plaintiff leave to amend her complaint to eliminate the class allegations contained therein. This order recited "counsel for defendants having advised the court that there is no objection to the proposed amendment, it appearing that this cause has not been certified as a class action, and that no notice of the suit has been furnished to the putative class, the court concludes that the amendment in the form attached as Exhibit "A" to plaintiff's motion should be allowed."

The amended complaint as filed, however, beside seeking to eliminate all class action allegations and thereby continue the suit only for plaintiff's individual claims, averred that on November 3, 1975, Janice Stewart filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging the denial by defendants of her rights under Title VII, and that on February 13, 1976, the United States Department of Justice issued a right to sue letter, which was attached as Exhibit "A" to the amended complaint. Defendants, on March 23, answered the amended complaint, again challenging the court's Title VII jurisdiction. Paragraph 3 of defendants' responsive pleading based their jurisdictional challenge upon the fact that "the plaintiff did not file the amended complaint within 90 days from the receipt of the letter dated February 13, 1976, from J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division, United States Department of Justice [and] therefore plaintiff has failed to invoke the jurisdictional prerequisites to bring an action under Title VII." Also, defendants reiterated their denials of racial discrimination in refusing to hire plaintiff or to consider her for employment in the City Clerk's office.

On April 26, 1977, a pretrial conference was held before the United States Magistrate, at which the defendants maintained their challenge to Title VII jurisdiction on the ground that the complaint was not amended within 90 days after receipt of the right to sue letter from the Department of Justice. At no time prior to trial on the merits did defendants request a separate hearing on their motion to dismiss plaintiff's Title VII claims by noticing their motion pursuant to our Local Rule G–8 in order to bring the matter, preliminarily, to the attention of the court in advance of trial; however, defendants maintained at trial on the merits that the court lacked Title VII jurisdiction.

During March 1978, the court conducted a full evidentiary hearing in a two and one-half day trial, when both sides offered extensive oral and documentary evidence. Briefs of counsel having been submitted, the case is now ripe for decision on the merits. In accordance with Rule 52(a), F.R. Civ.P., the court makes findings of fact and conclusions of law as follows:

## II. FINDINGS OF FACT

Janice Stewart, 21 years of age, and a graduate of Smith College, was single and resided at Pontotoc with her mother, Mrs. Earline Douglass. During the month of June, 1975, she secured employment as a clerk in the office of the North Mississippi Rural Legal Services at Oxford, which was 30 miles distant from her home. On July 7, she appeared at the office of Wright Haddox, City Clerk, to apply for employment in the City Clerk's office. Haddox told her that there were no vacancies, nor were job application forms available for her use. He did, however, provide her with a slip of

paper and requested that she write her name, address and telephone number thereon. He advised plaintiff that the mayor and board of aldermen hired all personnel in the City Clerk's office and that he would place on the mayor's desk the paper containing her information. Apparently, the mayor was not in his office at the time, and plaintiff made no attempt to contact him directly. Haddox did advise plaintiff that Polly Johnson, a long-time worker in the City Clerk's office, was absent because of illness, but she was expected to return to work. After plaintiff left, Haddox did not check with the mayor to ascertain whether he saw the note concerning plaintiff and he thought no more about the matter, for at no time did he present to the mayor and board of aldermen plaintiff's request to be considered for employment in the City Clerk's office. The first information received by the mayor and aldermen that plaintiff had sought such employment was imparted to them by plaintiff's filing suit in this federal district court.

Meanwhile, Mrs. Johnson's sick leave was extended for the balance of July and all of August. On September 2, 1975, the city authorities, at the board meeting, directed Haddox to employ temporary help in order to cope with the increased workload in the clerk's office occurring during the fall months. Beside Haddox, the work force in the clerk's office consisted of two white females, Carolyn Lauderdale and Norma Faye Simmons. After authority was granted to the clerk to employ temporary help, Anne Simmons, the sister-in-law of Norma Faye Simmons, was hired in October 1975. On October 29, plaintiff filed her charge of racial discrimination in employment against the "Pontotoc City Government;" this charge was received by the Jackson EEOC office on November 3, 1975.[2]

At the December 2 board meeting it was stated that Mrs. Johnson's health continued to be poor and that she should be granted an extended leave of absence. The aldermen voted that "it would be in the best interest of the City of Pontotoc, Mississippi, to declare a temporary vacancy in the city [clerk's] office and secure someone to fill the vacancy until Mrs. Johnson is able to return to work." Apparently, in view of the pending suit by plaintiff, the aldermen directed the city attorney to notify plaintiff about the temporary vacancy and request that she submit a resume to the mayor. William Sneed, city attorney, testified at trial that he prepared such a communication and mailed it to plaintiff at her Pontotoc address, sending the mayor a copy of the letter, but not to plaintiff's counsel of record. Moreover, Sneed was unable to produce a copy of the letter at trial. Both the mayor and plaintiff testified, however, that they never received Sneed's letter.

When no response was forthcoming from plaintiff, Mayor Stafford testified that he contacted James Ford, a local black attorney, to request that he contact plaintiff at her known place of employment at Oxford with the NMRLS to ascertain if she was still interested in working at city hall and, if so, to advise him. Ford contradicted the mayor's testimony substantially. Ford testified that though the mayor did talk to him about city employment for plaintiff, he did not request that he, Ford, act as mediator to learn if plaintiff wanted to work for the city. Ford acknowledged, however, that shortly after conferring with the mayor, and while visiting at NMRLS offices in Oxford, he mentioned the matter to plaintiff, but did nothing more than to inquire how her employment suit against Pontotoc was coming along. He denied that he told plaintiff about the job opening and to contact Stafford if she were interested. Thus, according to plaintiff, she received no word from anyone that the defendants were interested in hiring her as a clerical worker. Concededly, the mayor made no further ef-

---

**2.** Plaintiff's charge is as follows:

"I applied for a job at the city of Pototoc. They did not allow me to fill out an application nor did they give me anything to write my name and address on. However, I did have a piece of paper on which I left my name and address. There are no black people working for the city of Pontotoc. I feel that I have been discriminated against because of my color and because I am black and was not considered at all."

fort to contact plaintiff concerning the job opportunity.[3] When it appeared to the defendants that plaintiff was no longer interested in a city clerk's job, they hired Annie Givhan, a black female related to Ford, who was recommended to the mayor by Ford. The undisputed proof is that good relations had for some time existed between the mayor and Ford, as Ford had often been in contact with the mayor regarding employment opportunities for blacks in local private industry, as well as for various types of municipal jobs. The mayor testified unequivocally that Ford, after he contacted plaintiff at Oxford, told him that she had enrolled in the University of Mississippi Law School, that she had a job at Oxford, and therefore that she was no longer interested in working in the city clerk's office at Pontotoc.

Of whatever significance may be any effort to settle the suit by offering plaintiff employment in December, the undisputed fact is that Janice Stewart, in May 1975, while a senior at Smith College, had applied to the University of Mississippi School of Law for admission as a first-year law student at the fall 1975 semester (Deft. Ex. 1). This application was received by the law school on June 10, 1975, accompanied by a letter from plaintiff to the admissions committee, which stated as follows:

"I would like to study law at the University of Mississippi because of the University's excellent legal program and its social and political setting. I also hope to practice law in this state. After attending school in Florida and Massachusetts, I would like to come home and study law at the University. . . . If I am given the opportunity to study law and become a lawyer, this will allow me to lead an active and meaningful life and serve rural indigents in Mississippi and throughout the south."

Moreover, plaintiff, upon her acceptance by the Law School, became a full-time student in September 1975 and attended the University for the school year 1975–76, and also attended the 1976 summer school session. Because of low academic grades and plaintiff's unwillingness to repeat the first year's work, she resumed employment with NMRLS as a clerk. She worked full-time for that agency the remainder of 1976 and until August 1977, when she was accepted by Howard University School of Law in the fall of 1977. Because of her change in residence and marital status (see n. 1), plaintiff advised the court that she is presently unable to state whether she would or could accept employment at Pontotoc if a position were offered her.

Although plaintiff testified at trial that she would have preferred a job in the Pontotoc City Clerk's office in July 1975, rather than entering Law School, we find her testimony to be incredible, for her statement is completely inconsistent with her expressed aims and conduct prior and subsequent to her visiting the City Clerk's office on July 7, 1975. Granted that temporary summertime employment at Pontotoc might have been more desirable to her than working at Oxford, the court finds as a fact that plaintiff was not interested in permanent employment at Pontotoc should a vacancy arise in the City Clerk's office. As pointed out by defense counsel, plaintiff was paid regular compensation for 8 hours' service during each day of July, including July 7, by her employer NMRLS (pltf. Ex. 10, Time and Attendance Report for July 1975). Although the court excluded evidence that during the same month plaintiff made several applications for employment with Pontotoc employers other than the City of Pontotoc as no defense, or inadmissable to show her disputatious character, *East v. Romine, Inc.*, 518 F.2d 332 (5 Cir. 1975), the court cannot ignore that plaintiff's activities, while employed by NMRLS, were more consistent with her ambition to pursue a legal career than with a genuine desire to become a clerical employee of the City of Pontotoc.

---

**3.** The board did not terminate Mrs. Johnson's employment as a deputy clerk on extended sick leave, until its meeting of August 3, 1976, on which date a vacancy in her position was formally declared to exist.

The City of Pontotoc, according to the official 1970 census, has a population of 9,831 between the employable ages of 16 and 64. Of this figure, there are 8,266 whites and 1,565 blacks, resulting in a ratio of 84% white and 16% black in the total employable age group. Prior to plaintiff's application, no blacks had been employed in the city clerk's office, where, since 1971, the turnover of clerical employees had been small; all three persons employed as such were able to type with a reasonable degree of proficiency and take dictation.

The duties of the clerks, in addition to handling correspondence for the mayor and city clerk, consisted principally of typing minutes, tax rolls, tax receipts and handling other business in which adequate typing ability is required. In prior years, Mayor Stafford usually determined the ability of an applicant to type by informal testing. No vacancies were advertised publicly, and applicants learned of openings by "word of mouth." Once assigned to the job, the clerks have specific areas of responsibility, but each is required to assist the others in the general operation of the office. Since 1971 all persons hired have had acceptable typing and shorthand ability. Polly Johnson was senior in service, having been employed a number of years ago; Carolyn Lauderdale, first employed by the Housing Authority, has been in the city clerk's office since 1971; Norma Faye Simmons was hired in 1973, first on a temporary basis, and thereafter as a permanent employee. These persons constituted the work force when the plaintiff submitted her application to the city clerk. Anne Simmons, employed in October 1975 as temporary help, had typing ability and was able to perform the duties of the office with efficiency. Annie Givhan, the black replacement hired after plaintiff's suit was filed, had typing ability which was improved by her attendance at the Pontotoc Vo-Tech school; according to the mayor, she has proved to be a good employee.

Although no blacks had been employed in the city clerk's office before Annie Givhan, the evidence shows, without material dispute, that the mayor and other city officials had, for several years, made genuine efforts to hire blacks into various positions of employment with the City of Pontotoc. In particular, Stafford discussed with the black community, in various meetings at which he appeared, the need for more black employees; he actively sought blacks to apply for jobs with the police, fire and other municipal departments. This was confirmed by Attorney Ford and not contradicted by the plaintiff or her witnesses. For example, Don Stewart, plaintiff's brother, was first employed as assistant director of the Pontotoc Housing Authority, which, though an independing hiring entity, was nevertheless sponsored by the city. When Stewart later wanted to become a police officer but because of a physical infirmity was offered the job of dispatcher, he declined this offer of employment by the city in favor of a teaching position. Barry Ford, the brother of Attorney Ford, is presently employed as a police dispatcher. Boyd Easley, a black, now retired, was a long-time employee who served as assistant to the water department superintendent. Gene Autry, a black, was offered a permanent job as a police officer but he declined the position, preferring to go into private industry. Toy Lindsey, another black, was offered a position as a police officer but chose instead to become a deputy sheriff. Travis Lisbenbee, a black, resigned his post as a police officer in favor of a better job. Other blacks offered jobs as police officers were Jesse Duncan, Gene Vaughn, and James Dickson. The mayor, in the course of his testimony, recounted the continuing difficulty of securing blacks as permanent city employees because of better salaries paid by private employers, which were largely manufacturing firms operating in or within the vicinity of Pontotoc. Approximately 10 industries employing sizeable numbers of people and paying more than the minimum wage, operate at or near Pontotoc and each employs a substantial number of black citizens. Private employers pay compensation for overtime, insurance and other fringe benefits not paid to, or received by, city employees. James Ford,

put on by plaintiff, strongly corroborated the mayor's inability to hire blacks in the various city departments because of nearby better paying jobs with private industry.

An issue of fact was presented by the evidence as to whether plaintiff could type or take shorthand, qualifications which were required for one to be employed in the city clerk's office. Plaintiff, in answering interrogatories as well as in a pretrial deposition, stated that she could not type nor take shorthand. At trial, plaintiff stated that by this she meant that she had no formal courses or training in typing or shorthand, but that she could, in fact, do typing and in her work for NMRLS had a considerable amount of on-the-job training as a typist. Alvin Chambliss, an attorney connected with the Oxford office of NMRLS, testified that plaintiff could type satisfactorily and was an efficient employee. Concededly, the mayor gave no formal test for typing, nor did plaintiff have an opportunity to show her skill as a typist. The court resolves this issue in favor of plaintiff, since as a college graduate in a clerical position with a legal agency it is reasonable to believe that she did possess qualifications requisite for working in the city clerk's office. This finding, however, does not undercut our factual findings that (1) on July 7, 1975, no vacancy existed to replace Polly Johnson, deputy clerk, who was on sick leave but expected to return, and (2) even if plaintiff was an applicant for permanent employment—which we do not believe—the defendants did not, after rejecting or failing to consider plaintiff, continue to seek other applicants of plaintiff's qualifications for a permanent position in the city clerk's office.

### III. CONCLUSIONS OF LAW

(a) *Lack of Title VII Jurisdiction.*

▮ The threshold question is whether this court has Title VII jurisdiction in view of the procedural history previously outlined, where no action was brought against defendants, as public employers, within 90 days after the issuance of a right-to-sue letter by the Attorney General as required by 42 U.S.C. § 2000e–5(f)(1). It is well established that a district court lacks jurisdiction over a Title VII suit where either no right-to-sue letter has issued or suit is filed more than 90 days after the issuance of such letter. *East v. Romine, Inc.,* 518 F.2d 332 (5 Cir. 1975); *Beverly v. Lone Star Lead Constr. Co.,* 437 F.2d 1136 (5 Cir. 1971); *Dent v. St. Louis S. F. Ry. Co.,* 406 F.2d 399 (5 Cir. 1969). Admittedly, plaintiff's right-to-sue letter did not issue until February 13, 1976, nor did she amend or supplement her suit pending on that date, or within 90 days thereafter, to allege compliance with the jurisdictional prerequisites for a Title VII action. Instead, 13 months elapsed before plaintiff supplemented her complaint to allege such compliance, i. e., that on November 3, 1975—after the filing of her original action—she for the first time lodged a charge of racial discrimination against defendants with the EEOC, and on February 13, 1976, the Attorney General issued a right-to-sue letter at the request of her counsel. Plaintiff, recognizing the jurisdictional limitations of a district court in a Title VII action, nevertheless contends that such jurisdiction does exist, since the jurisdictional defect was cured by the filing of her belated amendment and before defendants moved for dismissal of the action.

▮ At the outset it is clear that Rule 12(b), F.R.Civ.P., grants to a defendant the option of incorporating into his responsive pleading seven specifically enumerated defenses, including the defense of lack of subject matter jurisdiction, which might otherwise be advanced in the form of a separate motion to dismiss. That raising the absence of subject matter jurisdiction only as a defense in a responsive pleading does not constitute a waiver of that point is emphasized by Rule 12(h)(3).[4] Courts have held that a motion to dismiss an action for lack of subject matter jurisdiction under Rule 12(b)(1) is but one of the many ways such

---

**4.** Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. Rule 12(h)(3).

defense may be presented; it is equally efficacious to raise the point by way of answer, *McNutt v. GMAC*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), or, for that matter, whenever the jurisdictional defect appears. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 391 (5 Cir. 1977). Nor must the parties necessarily raise the issue; a district court may consider lack of subject matter jurisdiction sua sponte. *Howard v. Lemmons*, 547 F.2d 290 (5 Cir. 1977). In view of this established jurisprudence, the failure of defendants to invoke Local Rule G–8 to present the jurisdictional issue to the court preliminarily is without legal significance, particularly since the defendants consistently raised the lack of Title VII jurisdiction in all responsive pleadings and before the United States Magistrate in pretrial conference. Plaintiff's argument that the defendants' failure to obtain a hearing on a motion of dismissal for lack of subject matter jurisdiction operates to cure the jurisdictional defect upon the filing of an amended pleading more than 90 days after the right-to-sue letter issues ignores not only Rule 12(b) but also the congressionally mandated jurisdictional prerequisites for a Title VII action. It is elementary that federal subject matter jurisdiction cannot be created by consent, waiver or even estoppel. *Mansfield C. & L. M. Ry. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884).

■ Plaintiff seeks to hurdle the jurisdictional barrier by reliance upon the doctrine of relation back recognized in the case law upon the filing of an amended pleading under Rule 15(c) in Title VII suits instituted prior to the issuance of a right-to-sue letter. Plaintiff cites several cases where jurisdiction was upheld where the plaintiff amended the suit filed prior to receipt of a right-to-sue letter *within* 90 days after its issuance, and if that were the case here, we would follow the reasoning of such decisions as *Budreck v. Crocker Nat'l. Bank*, 407 F.Supp. 635, 647 (N.D.Cal.1976), and *Black Musicians of Pittsburgh v. Local 60–471*, 375 F.Supp. 902 (W.D.Pa.1974). In other cases, no mention is made by the court of the date on which the amendment was filed, so that it is impossible to classify them as cases where more or less than 90 days elapsed from the issuance of the right-to-sue letter until the jurisdictional prerequisites were first presented to the court by the filing of a pleading, or right-to-sue letter. Decisions in this category are *Berg v. Richmond Unified School Dist.*, 528 F.2d 1208 (9 Cir. 1975); *Henderson v. Eastern Freight Ways, Inc.*, 460 F.2d 258 (4 Cir. 1972); *Guardians Ass'n. v. Civil Service Comm'n.*, 431 F.Supp. 526 (S.D.N.Y.1977); *Spirt v. Teachers Ins. & Annuity Ass'n. of America*, 416 F.Supp. 1019 (S.D.N.Y.1976); *Jones v. United Gas Improvement Corp.*, 383 F.Supp. 420 (E.D.Pa.1975); jurisdiction in these cases was assumed without consideration of the statutorily limited grant of jurisdiction to the 90-day requirement for the filing of an action, or the suit letter, within that period of time after its issuance. So long as the curative steps are taken within 90 days after the right-to-sue letter issued, we encounter no difficulty with the "relation back" of the Title VII claim to the date of filing of the original complaint, as expressly recognized by Rule 15(c). Plaintiff, however, would stretch the doctrine beyond its permissible limits, and in disregard of the congressional grant of Title VII jurisdiction, by arguing for its application to the present case where the jurisdictional prerequisites were first alleged in an amendatory pleading filed long after the expiration of 90 days from the date of issuance of the right-to-sue letter.

The only case which supports plaintiff's right to maintain a Title VII action under such a belatedly filed amendment is *Hoover v. Opportunities Indus. Center*, 348 F.Supp. 657 (W.D.Va.1972), where suit was filed July 30, 1971, the right-to-sue letter was received August 12, 1971, and plaintiff made no effort to amend her complaint alleging jurisdictional prerequisites until April 28, 1972, or nearly eight months later. The *Hoover* court reasoned that "when notice [of failure of conciliation] is forthcoming subsequent to the filing of a complaint in the federal court, but prior to any trial on the merits, such notice shall relate back

to the original filing date of the complaint." 348 F.Supp. at 660.

We decline to follow the rationale of *Hoover* in applying the relation back doctrine permitted by Rule 15(c) to Title VII when doing so would allow failure to comply with the strict time requirements which are mandatory conditions for suit under Title VII. Although the relation back doctrine serves a salutary purpose when the amendment asserts a claim arising out of the conduct or occurrence set forth in the original pleading, it cannot be made the vehicle for advancing new claims arising subsequent to the occurrence initially pleaded, by supplemental pleadings authorized by Rule 15(d), when such claims are based upon the violation of a statute, such as Title VII, with such specific provisions for its application. To allow such procedure would have, inevitably, the effect of expanding Title VII jurisdiction contrary to the Act as interpreted by the Fifth Circuit and federal courts generally. The Fifth Circuit has held that a district court may not allow any party to extend the congressional grant of jurisdiction. *Zambuto v. AT & T Co.,* 544 F.2d 1333 (5 Cir. 1977). In a recent decision, *Wrenn v. American Cast Iron Pipe Co.,* 575 F.2d 544 (5 Cir. 1978), the Fifth Circuit has reaffirmed the strictness of this rule by holding that

> the limitation period is mandatory, and plaintiffs who do nothing to call their case to the attention of the district court before the period runs will suffer dismissal.

575 F.2d at 546.

*Wrenn* emphasized that while a pro se plaintiff need do no more than present the court with the right-to-suit letter and request appointment of counsel to satisfy the requirement of "bringing a civil action," failure to take any action whatever within the 90-day period bars the claim. *Id.* In the case sub judice, plaintiff, at the filing of her original complaint and at all times thereafter, was represented by counsel but utterly failed to take even the minimal steps enunciated by *Wrenn* to bring the Title VII claim before the court and thereby vest it with jurisdiction.

■ Assuming, however, that Title VII jurisdiction in this case may be said to exist, we hold that plaintiff has failed to make out a prima facie case of racial discrimination against defendants under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The four elements required by *McDonnell Douglas* for a prima facie case are not present here. Instead, only two elements were proved, i. e., first that plaintiff, a black, is a member of a minority group, and secondly, that she presumably possessed adequate qualifications for a job in the city clerk's office. However, she failed to prove that defendants were seeking applicants for such a position, and necessarily, she was unable to show that any such position "remained open and the employers continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. As interpreted by *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), the *McDonnell Douglas* formula demands "that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant; an absolute or relative lack of qualification or *the absence of a vacancy in the job sought.*" (emphasis added).

The uncontradicted proof is that no vacancy existed on July 7, 1975, when plaintiff appeared at the city clerk's office with her request, and no vacancy for regular employment came into being until after plaintiff filed her suit. Moreover, we have found on substantial evidence that plaintiff, though possibly interested in temporary work during the summer months, was not an applicant for regular employment since she anticipated entering law school in the fall.

(b) *Cause of Action Under § 1981.*

■ Plaintiff's § 1981 claim is independent of her rights under Title VII. *Johnson v. Railway Express Agency, Inc.,*

421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Alpha Portland Cement Co. v. Reese*, 507 F.2d 607 (5 Cir. 1975). Nor is it necessary that plaintiff exhaust administrative remedies to prosecute her § 1981 claims. The successful maintenance of a § 1981 suit is governed by the two Supreme Court decisions of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), which require the demonstration of a racially discriminatory intent or purpose unless the plaintiff can show a history of past racial discrimination sufficient to impute impermissible intent. We hold from the evidence adduced that the defendants cannot be said to have been racially motivated in failing to consider plaintiff for employment. Indeed, the record is replete with instances of the mayor and other city officials seeking to hire blacks in various municipal departments. In fact, continuing dialogue was held between the mayor and the black community about the comparative benefits of municipal, as opposed to private, employment. We consider these efforts by the City of Pontotoc to clearly refute any inference of racial discrimination in employment opportunities arising from past history of the city's employment practices. We therefore reject plaintiff's § 1981 claims for failure to prove racially motivated intent or purpose in not hiring plaintiff, or considering her for employment.

### (c) *Claims Under § 1983.*

The purpose of 42 U.S.C. § 1983 is to provide a remedy for deprivation of constitutional rights under color of state law, i. e., constitutional torts. *Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 476, 5 L.Ed.2d 492, 497 (1961). Plaintiff asserts that either Wright Haddox' failure to ensure that the mayor and aldermen received word of her desire for employment or the mayor's and the city aldermen's subsequent failure to consider her was based on racial discrimination, and therefore such inaction rises to the level of a constitutional tort.

It has been found that Haddox was entrusted with no authority to hire or take applications for employment and that he so informed the plaintiff, and further, that it was only by reason of his actions in placing plaintiff's name and address on the mayor's cluttered desk, and allowing the information to be misplaced, that the mayor and aldermen were uninformed of her application. Plaintiff acknowledges that she neither directly applied to the mayor and aldermen nor did anything further to prosecute her request.

### (1) *The City.*

■ The City of Pontotoc is now a "person" under § 1983, *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and is therefore subject to suit under § 1983, just as the mayor, aldermen, and city clerk are.

■ In deciding whether the city can be held liable for Haddox' acts, *Monell, supra,* the Supreme Court's last word on the subject, provides the appropriate analysis. Under *Monell,* an employer/employee relationship standing alone does not make a city liable for the acts of a tortfeasor-employee. Rather,

> it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. at 694, 98 S.Ct. at 2038, 56 L.Ed.2d at 638. It is clear from our factual findings that Haddox was not "executing a policy or custom" of racial discrimination by the city when he misplaced plaintiff's application.

### (2) *The Mayor and Aldermen.*

■ As for the liability of the mayor and aldermen, who were unaware of plaintiff's application until she filed suit, it is difficult to see how they can be held liable for an incident of which they were not only unaware but also had no reason to be on notice. While it is true that a supervisory official might be held liable for the acts of

those under his direction in the Fifth Circuit, *Roberts v. Williams,* 456 F.2d 819, 825–28 (5 Cir. 1972), every official has his realm of responsibility and acts by others taken outside this realm of responsibility cannot fairly be attributed to the official. E. g., *Bryan v. Jones,* 530 F.2d 1210, 1215 (5 Cir. 1976). In this case, the plaintiff, although she was told by Haddox that the mayor and aldermen alone had hiring authority, did not bother to contact them regarding employment opportunities. Since they were unaware of the plaintiff's application through no fault of their own, they cannot be held liable.

3. *Wright Haddox.*

 Haddox may be held liable for damages under § 1983 if he

knew or reasonably should have known that the action he took *within his sphere of official responsibility* would violate the constitutional rights of [the plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury. (emphasis added).

*Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214, 225 (1975).

We decline to impose damage liability for the following reasons. First, any action Haddox took regarding plaintiff's employment was not within his "sphere of official responsibility," and he so told plaintiff. Secondly, the facts establish that Haddox did not act with any malicious intent to injure plaintiff. At best, his method of handling plaintiff's request amounted to nothing more than mere negligence, falling far short of an intentional tort. Finally, applying "the knew or should have known" standard of *Strickland,* Haddox had no reason to anticipate that his action would violate plaintiff's constitutional rights.

Let an order issue dismissing plaintiff's action with prejudice.