Leslie A. HIMMELBRAND

v.

M. P. HARRISON, III et al.

Civ. A. No. 79–0053–L.

United States District Court,
W. D. Virginia,
Lynchburg Division.

Feb. 5, 1980.

Arthur B. Davies, III, Davies & Peters, Lynchburg, Va., for plaintiff.

Roy B. Thorpe, Jr., Bedford, Va., for defendants.

## OPINION

TURK, Chief Judge.

This case arises from the termination of a policeman's employment with the City of

Bedford, Virginia. Plaintiff Leslie A. Himmelbrand brings the suit under 42 U.S.C. § 1983 alleging essentially that his rights to procedural due process were violated because his former employers have refused to grant his request for a grievance hearing. Named as defendants are, in addition to the City of Bedford, Chief M. T. Harrison, III, of the Bedford Police Department, D. Keith Cook, City Manager of Bedford, and each member of the Bedford City Council. All the individual defendants are sued in both their official and their personal capacities.

The case is before the court on cross motions for summary judgment. As will become clear, there are issues of fact in this case which will require resolution at trial. To the extent that there is agreement, however, the following appear to be the relevant facts.

Leslie A. Himmelbrand had been employed as a police officer by the City of Bedford since June 7, 1966. His employment ceased on December 31, 1978. The events which at this stage of the case appear most directly to have contributed to his termination occurred at the firing range of the Lynchburg Police Department. It evidently is the custom for Bedford's city policemen to use the Lynchburg Police Department firing range for instruction and practice in the use of firearms. On October 25, 1978, Mr. Himmelbrand reported to the Lynchburg range. Precisely what happened there is not clear. Defendants maintain in effect that Himmelbrand was guilty of misconduct at the range; Mr. Himmel-

brand, of course, denies the charge. In any event, Chief John K. Swan of the Lynchburg Police Department decided that "the services of our range will no longer be available" to Mr. Himmelbrand. In a letter dated October 27, 1978, Chief Swan notified Mr. Himmelbrand's superior, Chief Harrison of the Bedford Police Department, of his decision to exclude Mr. Himmelbrand from the range.[1]

Chief Harrison summoned Mr. Himmelbrand to his office on October 30, 1978, to discuss Mr. Himmelbrand's exclusion from the firing range. During the course of the October 30 conversation with Chief Harrison, Mr. Himmelbrand, according to his own affidavit, denied most of the charges of misconduct contained in Chief Swan's October 27 letter.[2] At the close of the October 30 conversation, Chief Harrison stated that he would "look into the matter and get back in touch" with Mr. Himmelbrand.

On the next day, October 31, 1978, Mr. Himmelbrand was again summoned to Chief Harrison's office. What happened during that meeting and thereafter is in substantial dispute. In the words of Mr. Himmelbrand's affidavit:

I was informed by Police Chief Harrison that due to the allegations contained in Chief Swan's letter I could no longer qualify in the use of a firearm and therefore would be of no use to the Police Department of the City of Bedford. Police Chief Harrison then stated that he

---

1. So far as can be gleaned from the current record, a key factor behind Chief Swan's decision appears to be a letter in which Commander R. E. Coleman of the Lynchburg Police Department reported that Himmelbrand "complained constantly about conditions at the range," that he "had to be told several times to keep his finger off of the trigger until the weapon was clear of the holster," and that "Officer Carrol Baker overheard Himmelbrand telling another officer that he was damned tired of this shit. . . ." Commander Coleman's letter to Chief Swan concluded, "With the attitude that this subject has, I would not like to see him at our range any more." Chief Swan adopted Commander Coleman's position on the matter and forwarded Coleman's letter to Chief Harrison.

In his affidavit, however, Chief Harrison states that the shooting range episode only "exemplified" the "continuing problems that plaintiff was having with his employment as a police officer." Chief Harrison avers that Himmelbrand had an "increasingly poor performance record" as a policeman.

2. Himmelbrand states in his affidavit that during the October 30 conversation he "acknowledged [he] had been told on two occasions to keep [his] fingers off the trigger when drawing the weapon from the holster." He states that he "categorically denied" all the other allegations contained in the October 27 letter from Chief Swan.

wanted my resignation and that if I did so, he would see that I got a favorable job evaluation. He stated that if I did not resign, he would give me an unfavorable job evaluation. He stated further that if I did not resign, he had a "letter" ready. It was clear to me at that time that if I did not resign, or in Chief Harrison's words, if I chose "to fight him", I would be suspended without pay pending final resolution of the complaints lodged against me.

Chief Harrison's affidavit relates a markedly different impression of the October 31 meeting. He states that he· "did not demand plaintiff's resignation," that he "did not threaten plaintiff with discharge," and that he "did not coerce or in any way force plaintiff to resign." Chief Harrison concludes that "plaintiff chose to resign voluntarily." [3]

Whatever the true purport of the October 31, conversation, Mr. Himmelbrand did sign a letter of resignation dated November 1, 1978. This letter provided:

> As per our conversation of 31st October, 1978, I am herewith submitting my resignation to be effective the 30th of November, 1978. This is brought about by complaints from Lynchburg Police Department regarding · my reported conduct while on the range on the 25th of October 1978. Coupled with other complaints that have been lodged against me I feel

that I can no longer do an effective job as a police officer for the City of Bedford.

Subsequently, on November 16, 1978, in a letter addressed to Chief Harrison and to City Manager D. Keith Cook, Mr. Himmelbrand attempted to withdraw the resignation. Mr. Himmelbrand also at that time requested a grievance hearing.[4] He stated his belief—in light of his discovery that much of the information which led to the termination decision was inaccurate—that he could completely exonerate himself if he were granted a hearing.[5] Chief Harrison, however, refused to permit Mr. Himmelbrand to withdraw the resignation and declined to honor Mr. Himmelbrand's request for a grievance hearing. Chief Harrison stated his position in a letter dated November 27, 1978:

> Having accepted your letter of resignation in good faith, and having relied upon it, I see no reason now to reverse the decision made. Your resignation was your free act, done knowling [sic] what your alternatives might be. Having so made your choice, I intend to continue to rely upon it. Your resignation, therefore, will stand.

On December 18 the City Attorney announced "the position of the City of Bedford": the resignation "will proceed as scheduled."

On January 8, 1979, plaintiff, by his counsel, formally requested the grievance hear-

---

**3.** Plaintiff's motion to strike sections of Chief Harrison's affidavit as relating "mere conclusions" of the affiant which "would not be admissible in evidence" is denied. Rule 704 of the Federal Rules of Evidence provides: "Testimony in the form of an opinion . . . is not objectionable [solely] because it embraces an ultimate issue to be decided by the trier of fact." Plaintiff's motion to strike portions of the affidavit of D. Keith Cook is denied for the same reason.

**4.** The "Law-Enforcement Officers' Procedural Guarantees," Va.Code § 2.1–116.1 (1979) *et seq.*, provide for an extensive grievance mechanism, including prior notice and a formal, post-termination hearing before a neutral panel whenever a Virginia policeman is "dismissed, demoted, suspended or transferred for punitive reasons." Va.Code § 2.1–116.5 (1979).

**5.** Plaintiff focuses on his exclusion from the Lynchburg firing range as the event which precipitated his termination. He implies in his affidavit that that exclusion should not have resulted in his termination because he "could qualify in the use of firearms at the firing range for the City of Roanoke or any other police firing range and that Police Chief Harrison knew this fact."

It should be noted that the issue of whether Mr. Himmelbrand's termination was proper or not is relevant in this case only to this extent: If just cause is found to have existed for the termination, he would not be entitled to backpay as compensatory damages for any proven violations of his right to procedural due process. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Burt v. Abel*, 585 F.2d 613 (4th Cir. 1978).

ing procedure provided in the "Law-Enforcement Officers' Procedural Guarantees." Va.Code § 2.1–116.1 (1979) *et seq.* This request was addressed both to Chief Harrison and to City Manager Cook. The Bedford City Attorney responded in behalf of these defendants on January 12, 1979. Their position with respect to the hearing was—and remains—that Mr. Himmelbrand had voluntarily resigned, and that a voluntary resignation was beyond the coverage of the statutory grievance procedure. They contend, in effect, that Mr. Himmelbrand waived his right to a hearing by submitting the resignation letter.

Mr. Himmelbrand then brought this suit alleging violations of his right to procedural due process under the fourteenth amendment. He seeks $75,000.00 in damages for back pay and other benefits lost as a result of the alleged violations of his rights, as well as reinstatement and an award of attorney's fees. All of the defendants and the plaintiff have filed motions for summary judgment.[6]

Essentially, the motions and briefs raise three critical issues. First, it is necessary to determine the extent to which Mr. Himmelbrand may claim fourteenth amendment protection. Second, the court must determine which of the defendants named here are properly suable under § 1983. Finally, the court will address the questions of the voluntariness of Mr. Himmelbrand's resignation and the possible waiver of his rights in executing the resignation letter.

## I. PROCEDURAL DUE PROCESS

■ In their motions for summary judgment defendants urge that Mr. Himmelbrand is not entitled to a hearing under the fourteenth amendment because he has not been deprived of any interest protected by the constitution. The proper framework for analysis in cases such as this is well known. The Due Process Clause of the fourteenth amendment requires procedural safeguards only where the state deprives a

person of a liberty interest or a property interest. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Thus, in order to show that he is entitled to procedural due process under the federal constitution, a terminated public employee must show that in losing his job, he was deprived of a property or liberty interest. The controversy in the instant case has focused on whether Mr. Himmelbrand had a property interest in his employment.

■ The source of the property interests protected by the fourteenth amendment was outlined in *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709: "Property interests," the Court explained, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." When a public employee can demonstrate that he has a "legitimate claim of entitlement to continued employment," *Sindermann*, 408 U.S. at 602, 92 S.Ct. at 2700, he establishes his possession of a property interest in his job, the deprivation of which must be accompanied by a hearing at his request. Id. at 603, 92 S.Ct. at 2700. The sufficiency of such a claim of entitlement may be determined by reference to state law—"rules and understandings, promulgated and fostered by state officials . . . ." *Id.* at 602, 92 S.Ct. at 2700.

■ Mr. Himmelbrand contends that the procedural safeguards of the "Law-Enforcement Officers' Procedural Guarantees," Va.Code § 2.1–116.1 (1979) *et seq.,* themselves give rise to a "legitimate claim of entitlement." He maintains, in effect, that the "Law Enforcement Officers' Procedural Guarantees" constitute an incident of his employment and that, as such, they pro-

---

6. Earlier in this case the court vacated a memorandum opinion and order which had been entered on September 27, 1979. Additional motions for summary judgment have now been filed, accompanied by numerous affidavits.

vide him with a property interest in his job.[7]

In *Prince v. Bridges*, 537 F.2d 1269, 1272 (4th Cir. 1976), the Fourth Circuit stated:

A constitutional guarantee of procedural due process arises when a public employee is discharged in violation of the procedural rules designed to protect him.

Similarly, this court has previously determined that where a public employee can show that when he was discharged, "he was denied the benefit of local procedural and personnel rules which would have served to protect his employment status," such a public employee demonstrates a legitimate property interest which merits constitutional protection. *Ely v. Honaker*, 451 F.Supp. 16, 19 (W.D.Va.1977).

■ Those principles are fully applicable in the instant case. Mr. Himmelbrand claims that he was coerced into resigning and was deprived of the benefits of the "Law-Enforcement Officers' Procedural Guarantees" set out in the Virginia Code. That statute calls for extensive procedural safeguards, including an adversary, trial-type hearing. Va.Code § 2.1–116.5 (1979). These "Procedural Guarantees" clearly are designed, as are all measures of procedural due process, to minimize arbitrary governmental decisionmaking.[8] By its own terms, the statute offers Virginia policemen more than a "unilateral expectation" that their employment will not be arbitrarily terminated. *Roth*, 408 U.S. at 564, 92 S.Ct. at 2703. It furnishes, as its title suggests, a "guarantee" that the truth will be aired before a grievance panel.[9] It gives Virginia's policemen a "legitimate claim of entitlement to continued employment" at least to the extent that it furnishes insurance against arbitrary employment actions. The court holds that the "Law-Enforcement Officers' Procedural Guarantees" set out in the Virginia Code provided Mr. Himmelbrand with a property interest in his continued employment. The Due Process clause of the fourteenth amendment, therefore, became implicated if, as a factual matter, Mr. Himmelbrand was deprived of the benefits conferred by Va.Code § 2.1–116.1 (1979), *et seq.*[10]

7. The court sees no merit in plaintiff's contention that the grievance procedure outlined in the City of Bedford Police Manual furnishes plaintiff with a protected property interest in his employment. Section 17–1.2 of the policy manual appears to exclude from coverage law enforcement officers who have elected to proceed under Va.Code § 2.1–116.1 (1979) *et seq.*

8. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. In *Carey v. Piphus*, 435 U.S. 247, 259–60, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978), the Court observed that the purpose of rules of procedural due process was to " 'minimize substantively unfair or mistaken deprivations of' life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests."

9. It is true that the "recommendations" of the grievance panel are "advisory only" when transmitted to the policeman's superiors. Va. Code § 2.1–116.7 (1979). Nevertheless, the panel's recommendations are to be accorded "significant weight." *Id.* And this court cannot presume that an employer would automatically or arbitrarily ignore the conclusions of a grievance panel assembled pursuant to Va. Code § 2.1–116.5.2 (1979). Rather, the appropriate judicial presumption would seem to be that when all the facts come to light, official action will be "regular." *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976).

10. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), does not command a different result. That case—a criminal prosecution in which the defendant sought judicial enforcement of a federal regulation by means of the fourth amendment exclusionary rule—is quite different from this one. There, surveillance of the defendant's activities had been conducted in violation of an agency regulation; the court held that admission at trial of evidence obtained pursuant to such surveillance did not offend the constitution implying that violation of the regulation gave rise to no constitutional right. *See Poston v. Martin*, No. 79-6492, slip op. at 5 n.2 (4th Cir. Aug. 31, 1979) (unpublished). Here, where the remedy sought is not the exclusion of relevant evidence at a criminal trial, wholly different considerations are at play. *See McCourt v. Hampton*, 514 F.2d 1365, 1370 (4th Cir. 1975). *See also Prince v. Bridges*, 537 F.2d 1269, 1272 (4th Cir. 1976).

In *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Supreme Court upheld the district court's conclusion that North Carolina law did not give a city policeman a property interest in his employment. In this case, however, unlike the situation in *Bishop*, there is no suggestion in the current record that Mr. Himmelbrand held his position merely "at the will and pleasure of the city." 426 U.S. at 345, 96 S.Ct. at 2078. Indeed, the extensive, formal grievance procedure outlined in the Virginia Code strongly suggests the contrary.[11] Further distinguishing *Bishop* is the critical fact alleged in this case that statutory procedural safeguards have been disregarded by the employing agency. *See* 426 U.S. at 345–46, 96 S.Ct. at 2077–78.[12]

In summary, the court concludes that the Due Process Clause of the fourteenth amendment is implicated when, as is contended here, a Virginia law-enforcement officer is "dismissed, demoted, suspended or transferred for punitive reasons." Va.Code §§ 2.1–116.2, .4, .5 (1979).[13]

## II. PROPER DEFENDANTS UNDER § 1983

It is argued that *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), requires summary judgment for the defendants and dismissal of the complaint as to the City of Bedford, the City Manager, and the members of City Council.

### A. The City

In *Monell*, the Court formulated the test for municipal liability as follows:

> Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

436 U.S. at 690, 98 S.Ct. at 2035, 2036.

The issue for resolution here is whether an isolated deprivation of procedural due process committed pursuant to a single personnel decision, as is alleged in this case, can result in municipal liability. The central difficulty in finding that a discrete, isolated episode—however egregious or arbitrary—may satisfy *Monell* arises from the opinion's emphasis on "policy or custom." 436 U.S. at 694, 98 S.Ct. at 2037. *Monell* is explicit that "the touchstone" of municipal liability is that "official policy is responsible for a deprivation of rights protected by the Constitution." 436 U.S. at 690, 98 S.Ct. at 2036. Yet precisely what constitutes "policy" remains unarticulated. The *Monell* litigation itself arose from action taken in accordance with officially promulgated personnel rules regarding pregnancy leave. *See* 436 U.S. at 661 n. 2, 98 S.Ct. at 2021. The opinion most directly contemplates "widespread" practices, 436 U.S. at 691, 98 S.Ct. at 2036, the impact of which would be felt "city-wide"—a pattern of repeated official conduct which would adversely affect the rights of many people. 436 U.S. at 661 n. 2, 98 S.Ct. at 2021. Nothing of that nature is alleged in this case.

---

11. Although Va.Code § 2.1–116.6 (1979) does in certain specified circumstances permit "immediate suspension," even in such cases of "immediate suspension" the extensive post-termination procedures prescribed in Va.Code § 2.1–116.5 must be complied with.

12. The Supreme Court in *Bishop* deferred to the district court's "tenable" conclusion that, under a local ordinance, the plaintiff held his job "at the will and pleasure of the city." 426 U.S. at 345, 347, 96 S.Ct. at 2078. The Supreme Court itself did not undertake an independent analysis of the local law in question because, as the court stated, "we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown to be unreasonable." 426 U.S. at 346 n. 10, 96 S.Ct. at 2078, n. 10 (quoting *Township of Hillsborough v. Cromwell*, 326 U.S. 620, 630, 66 S.Ct. 445, 451, 90 L.Ed. 358 (1946). The *Bishop* court simply indicated that whether a property interest is conferred by statute depends upon an analysis of the particular statute involved. 426 U.S. at 345, 96 S.Ct. at 2077.

13. Plaintiff does not challenge the sufficiency of the procedures provided by Va.Code § 2.1–116.1 (1979) *et seq.*

A clearly permissible reading of *Monell* would allow municipal liability where the "action that is alleged to be unconstitutional implements or executes a . . . decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2036 (emphasis added). If a given personnel decision and the procedures to be followed in implementing it can be deemed to have been "officially adopted and promulgated by [the city's] officers," 436 U.S. at 690, 98 S.Ct. at 2035, then *Monell* would appear to be satisfied, and municipal liability would not be foreclosed. *Monell* recognizes, moreover, that discrete "acts" of governmental officials "may" in some cases "fairly be said to represent official policy." 436 U.S. at 694, 98 S.Ct. at 2038. Under this reading, municipal liability may be predicated upon the conduct of a single city official, so long as his conduct actually represents the official position of the city in a given matter. In short, the unconstitutional execution or implementation of a "specific policy directed at just one individual" may, under this reading, lead to municipal liability. *Smith v. Ambrogio*, 456 F.Supp. 1130, 1134 n. 3 (D.Conn.1978).

This conclusion finds support in the decisions that have interpreted *Monell*. The Fourth Circuit has read *Monell* as holding that municipalities may be subject to liability under § 1983 for constitutional deprivations which result from "official action." *Burt v. Abel*, 585 F.2d 613, 617 n. 9 (4th Cir.

1978). The *Burt* court defined "official action" simply as "action taken pursuant to an official municipal policy, decision or custom." *Id. Burt*, like the instant case, was a *Roth-Sindermann* type suit; the plaintiff there alleged violations of procedural due process in her discharge as a teacher. The court in *Burt* stated:

[I]t appears to us that a discharge from municipal employment is quite clearly an official action where, as here, the discharging body is authorized by the municipality to make such decisions.

*Id.* Other courts, applying *Monell* in cases involving alleged violations of procedural due process, have reached similar conclusions.[14]

In this case, the decision not to afford Mr. Himmelbrand the statutory hearing was "officially adopted and promulgated" at least by D. Keith Cook, the City Manager. The City Manager, through the City Attorney, announced "the position of the City of Bedford": Mr. Himmelbrand's termination would stand and he would not be afforded a hearing. The court cannot conclude on the current state of the record that this "act" of the City Manager cannot "fairly be said to represent official policy" in the matter of Mr. Himmelbrand's termination. Accordingly, the motion for summary judgment in favor of the defendant City of Bedford will be denied.

---

14. *See, e. g., Ohland v. City of Montpelier*, 467 F.Supp. 324, 340 (D.Vt.1979) (discharge of one policeman found to be an official act carried out pursuant to established custom); *Williams v. Codd*, 459 F.Supp. 804, 817 (S.D.N.Y.1978) (cause of action stated under § 1983 against police department by allegation that "highest ranking officials in the Police Department" were involved in alleged conspiracy to deprive plaintiff of due process rights). *Cf. Stewart v. City of Pontotoc*, 461 F.Supp. 767, 777 (N.D. Miss.1978) (no "policy or custom" of racial discrimination where city clerk, in apparent negligence, "misplaced plaintiff's application" for employment).

The requirements of *Monell* were found to have been met in *Goss v. San Jacinto Junior College*, 588 F.2d 96 (5th Cir. 1979). In *Goss*, a college's board of regents voted not to renew an instructor's contract on the recommendation of the college president because of the instruc-

tor's having engaged in constitutionally protected activity. Ruling that *Monell* was satisfied, the court reasoned that the college president was "surely one 'whose edicts or acts may fairly be said to represent official policy.'" 588 F.2d at 98. In *Moore v. Tangipahoa Parish School Bd.*, 594 F.2d 489, 491 (5th Cir. 1979), the plaintiffs had alleged that "the defendants '[had] engaged in a policy and practice of coercing and intimidating Negro teachers·in an effort to force Negro teachers to resign their positions.'" Chief Judge Brown ruled for the Fifth Circuit that the defendant School Board was subject to liability under *Monell*, not because of the system-wide character of the defendants' conduct but rather "[b]ecause there is no doubt but that personnel decisions are 'officially adopted and promulgated' by the members of the School Board . . . .." 594 F.2d at 493.

## B. The Municipal Officials

Here, as in *Monell* the decision that the City of Bedford is suable "necessarily decides" that the municipal officials named here may be sued in their official capacities. 436 U.S. at 690 n. 5, 98 S.Ct. at 2035. If the city officials sued here are to escape liability, it therefore will have to be for reasons other than the degree to which official policy underlay the unconstitutional conduct alleged in this case.

■ *Monell* confirms that liability under § 1983 may not be premised solely upon the doctrine of *respondeat superior*. Rather, "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

■ Plaintiff has alleged sufficient personal involvement on the part of Chief Harrison and City Manager Cook. Allegedly, both Chief Harrison and City Manager Cook announced and carried out the decision to refuse Mr. Himmelbrand's request for a hearing. The motions for summary judgment in favor of defendant M. T. Harrison, III, and defendant D. Keith Cook will, accordingly, be denied.[15]

## C. The Members of City Council

With respect to the members of City Council, however, further analysis is necessary.

■ An individual defendant's mere failure to prevent unlawful conduct—despite his knowledge of it and despite his probable ability to prevent it—is not sufficient personal involvement to warrant § 1983 liability. *Kohler v. Hirst*, 460 F.Supp. 412 (E.D.Va.1978). *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). *But see Lee v. Downs*, 470 F.Supp. 188, 191 (E.D.Va.1979) (imply-

ing that knowledge and acquiescence alone may constitute sufficient personal involvement).

■ It might possibly be the case here that some members of the Bedford City Council affirmatively recommended and participated in the decision not to accord Mr. Himmelbrand a hearing. Such a degree of personal involvement on the part of members of council might well satisfy *Vinnedge v. Gibbs. See Kohler v. Hirst*, 460 F.Supp. 412, 421 n. 12 (E.D.Va.1978). Those, however, are not the allegations made by the plaintiff here. Mr. Himmelbrand asserts in this regard only that the City Manager "notified the members of City Council, in closed session, of plaintiff's employment dispute. No action was taken by the City Council on the dispute." The complaint avers merely that "city council is responsible for all policy matters and controls the appropriation of funds, levies, taxes and contracts debts." Neither the pleadings nor the affidavits suggest that any members of Council personally participated in the matter of Mr. Himmelbrand's termination.[16] Therefore, the court will grant the motion for summary judgment in favor of each member of the Bedford City Council.

## III. THE VOLUNTARINESS OF THE RESIGNATION

■ According to the defendants, Mr. Himmelbrand voluntarily "left the employ of the City of Bedford by way of resignation," thereby effectually waiving his rights. It is clear that genuine issues of material fact exist concerning the circumstances of Mr. Himmelbrand's resignation. If the termination may truly be characterized as a voluntary resignation given with full knowledge of the procedural rights and given without threat of discharge or other

---

**15.** The availability in the circumstances of this case of the good-faith immunity defense, *Paxman v. Campbell*, No. 75–1506, 612 F.2d 848 (4th Cir. 1980), is not before the court.

**16.** Plaintiff does state that he informed Russell J. Otey, Mayor of Bedford and a member of

City Council, of his termination and of the refusal to reinstate him or to grant him a hearing. He does not state, however, that Mr. Otey played any affirmative decision-making role in the manner in which the City handled the termination.

retribution—rather than as a "dismissal"—it would appear that the procedural guarantees of Va.Code § 2.1–116.1 (1979) *et seq.*, and thus of the fourteenth amendment, would be inapplicable in this case. If, on the other hand, Mr. Himmelbrand's "decision" to resign and to forego the grievance procedure was actually obtained only as a result of coercion, such as, for example, the threat of discharge with a bad recommendation, or was made involuntarily, then the termination would constitute a "dismissal" and the procedural mandates of Va.Code § 2.1–116.1 (1979) *et seq.* should have been complied with. The record is contradictory on this critical point, and this aspect of defendants' motion for summary judgment must, therefore, be denied.

## IV. THE WITHDRAWAL OF THE RESIGNATION

Plaintiff asserts in support of his motion for summary judgment that defendants violated his constitutional procedural rights by refusing to process his grievance request after the withdrawal of his resignation, a withdrawal plaintiff contends was fully effective to reinstate his employment with the city. In light of the court's conclusion that due process attaches, in the first instance, when a public employee is terminated in violation of rules which would serve to protect his employment status, it is unnecessary here to determine whether, as plaintiff urges, due process attaches subsequently when the former employee seeks to withdraw the resignation.

## V. CONCLUSION

For the foregoing reasons, the court denies the motion of the plaintiff for summary judgment, denies the motions of the defendants M. T. Harrison, III, D. Keith Cook and the City of Bedford for summary judgment, but grants the motions for summary judgment of each defendant member of the Bedford City Council.