Marilyn MANDEL, Barbara P. Bennett, Arthur R. Spencer, and Robert F. Crawford, Plaintiffs,

v.

George ALLEN, in his official capacity as Governor of the Commonwealth of Virginia, Jay Timmons, Michael Thomas, Robert T. Skunda, Kay Cole James, Sr., Theoron J. Bell, and Ronald G. Gordon, in their individual and official capacities, and William E. Landsidle, in his official capacity as the Comptroller of Virginia, Defendants.

Civ. A. No. 3:94cv758.

United States District Court, E.D. Virginia, Richmond Division.

June 16, 1995.

Carolyn P. Carpenter, Carol D. Woodward, Eileen N. Wagner, Carpenter, Woodward & Wagner, Richmond, VA, for plaintiffs.

Neil A. McPhie, Peter R. Messitt, Office of Atty. Gen., Richmond, VA, for defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Marilyn Mandel, Barbara P. Bennett and Arthur R. Spencer, three former employees of the Commonwealth of Virginia, and Robert F. Crawford, a current employee, instituted this action in state court. It was removed to this court by the defendants, who are Virginia's Governor, several cabinet secretaries and several other state executives.

The plaintiffs seek damages and declaratory and injunctive relief under 42 U.S.C. § 1983 for alleged violations of the Fifth and Fourteenth Amendments to the United States Constitution arising from state actions

by which the jobs held by Mandel, Bennett and Spencer were abolished and Crawford's job was reclassified. All four plaintiffs also assert deprivations of rights under Article I, § 9 (ex post facto laws) and Article I, § 11 (due process) of the Virginia Constitution caused allegedly by the improper application to them of the Virginia Personnel Act and certain regulations promulgated under the statute.

The action is now before the court on Plaintiffs' Motion for Partial Summary Judgment on all issues of liability and Defendants' Motion for Summary Judgment to dispose of the action in its entirety. For the reasons set forth below, the defendants' motion is granted and the action is dismissed.

## STATEMENT OF FACTS

The administrative and personnel actions which spawned this litigation took place in May and June 1994. They were prompted by the efforts of Virginia's executive branch to increase the efficiency and to reduce the cost of state government. The plaintiffs' challenge to those administrative and personnel actions is based on an amalgam of several constitutional principles, each of which, to some extent, relates to the property rights of government employees in their employment. None of those principles, however, provides the basis for the claims asserted, or the relief sought, in this action.

Although each plaintiff's claim is somewhat unique to his or her particular employment, there are common background facts which are central to the common legal themes on which the plaintiffs rely. For instance, all four claims arise in the context of the Virginia Personnel Act ("VPA"), Va.Code §§ 2.1–110 to 2.1–116, and the Policies and Procedures Manual (the "Personnel Manual"), promulgated by Virginia's Department of Personnel and Treasury ("DPT") pursuant to Va.Code § 2.1–114.5(3). To properly analyze the plaintiffs' claims, it is, therefore, necessary to understand the common nucleus of facts from which the claims proceed and the applicable provisions of the VPA and the Personnel Manual on which the claims rely.

## A. Virginia's Personnel System

The VPA is the statutory foundation for Virginia's public employment program. Building upon this legislation, the DPT, which is established by Va.Code § 2.1–114.3, has promulgated rules in the Personnel Manual pursuant to Va.Code § 2.1–114.5(13). Taken together, then, the VPA and the Personnel Manual establish Virginia's personnel system, and they form the basis for the legitimate expectations of government employees in their employment by the state.

The stated purpose of the VPA is "to ensure for the Commonwealth a system of personnel administration based on merit principles and objective methods of appointment, promotion, transfer, layoff, removal, discipline, and other incidents of state employment." Va.Code § 2.1–110. As a mechanism for the consistent application of its basic objectives, the VPA requires the Department of Employee Relations Counselors ("DERC") to "establish a grievance procedure" as an "immediate and fair method for the resolution of disputes which may arise between an agency and its employees." Va. Code § 2.1–114.5:1. The same section of the VPA sets out certain minimal requirements for this procedure.

However, under the VPA, certain employees are exempt from the classified employment scheme. In particular:

The provisions of [the VPA] shall not apply to:

\* \* \* \* \* \*

16. The following officers and employees of executive branch agencies: *those who report directly to the agency head.*

\* \* \* \* \* \*

*Each Governor's Secretary shall have final authority in determining on an ongoing basis the officers and employees exempted by this subdivision and pursuant to its provisions.* Such officers or employees shall thereafter serve at the pleasure and will of their appointing authority. The Department of Personnel and Training shall advise and assist each Governor's Secretary in making these

determinations and shall be responsible *for maintaining an ongoing and up-to-date list of the affected positions.* . . .

Va.Code 2.1–116(A) (emphasis added). A state employee who is covered by the VPA is referred to as a "classified" employee. An employee who is not covered by the VPA is referred to as an "exempt" employee.

The version of Va.Code § 2.1–116(A) cited above is the result of legislation, commonly referred to as House Bill 776, which was passed in early 1994 to be effective on July 1, 1994. Those employees exempted from coverage under the VPA by this legislation, then, are sometimes referred to as "776 employees."

Before July 1, 1994, the category of state employees exempt from the VPA's protections was larger than before the enactment of H.B. 776 in that the exempt category included: (1) employees who reported directly to an agency head; and (2) those who served at the level immediately below that level *and* whose salary grade was 16 or higher. Va.Code § 2.1–116(A) (Michie 1987, main volume). Because the pre–1994 version of the statute was enacted by legislation known as Senate Bill 643, employees exempted by its terms are sometimes referred to as "643 employees."

At its core, this action involves access to the grievance and layoff rights established by the VPA and the Personnel Manual. Classified employees are entitled to file grievances with respect to certain personnel actions taken as to them. Indeed, the VPA explicitly identifies the types of complaints that are included in, and excluded from, the grievance procedure. In that regard, "grievance" is defined as a

complaint or dispute by an employee relating to his or her employment, including, but not necessarily limited to:

(i) disciplinary actions, including dismissals, demotions and suspensions, provided that dismissals shall be grievable whenever resulting from formal discipline or unsatisfactory job performance;

(ii) the application or interpretation of personnel policies, procedures, rules and regulations . . . ;

(iii) acts of reprisal as the result of utilization of the grievance procedure or of participation in the grievance of another state employee; and

(iv) complaints of discrimination. . . .

Va.Code § 2.1–114.5:1 A. The statute is equally explicit in making clear that certain matters are beyond the reach of the grievance procedure. In that regard, the VPA provides:

Management reserves the exclusive right to manage the affairs and operations of state government. Accordingly, the following complaints are nongrievable: (i) establishment and revision of . . . position classifications, . . . [and] (vi) . . . termination, layoff, demotion or suspension from duties because of lack of work, reduction in work force, or job abolition.

Va.Code § 2.1–114.5:1B.

Virginia's personnel system also includes procedures for implementing layoffs. Those procedures are borne of the Governor's statutory power to "[p]romulgate such rules . . . as he may consider necessary . . . to govern . . . the order and manner in which layoffs shall be made." Va.Code § 2.1–114.2C. Pursuant to that power, the Personnel Manual, Policy 1.30, details the Commonwealth's layoff policy, the stated objective of which is "to permit agencies to implement a reduction in force, using objective, uniform criteria."

Two layoff provisions occupy a significant role in this action. The first is Policy 1.30(III)(A), entitled "Discontinuing Positions," which provides that "[a]fter an agency head has identified the organizational units and occupational classes from which positions will be discontinued, the agency must discontinue positions in" a particular "sequence." Second, Policy 1.30(III)(C), entitled "Reassigning Affected Employees," specifies that: "After an agency has identified all affected employees, it must attempt to reassign them within the agency following [specified] placement steps."

Because the VPA allows a classified employee to grieve "the application of personnel policies, procedures, rules and regulations," Va.Code § 2.1–114.5:1(A)(ii), a misapplication of the layoff procedures to a classified em-

ployee is grievable. The layoff provisions, therefore, provide some measure of protection for classified employees even when the loss of a job occurs pursuant to an action which itself is not grievable.

With this basic statutory and regulatory personnel system in mind, the court now turns to the personnel decisions of which the plaintiffs complain.

## B. The Administrative Decisions and the Ensuing Personnel Actions

The election campaign that produced Virginia's current Republican chief executive was rife with assertions of the need to reduce the size and cost of state government and to make it operate more efficiently. (*See* Defendants' Reply Memorandum, Ex. 3 (Thomas Dep.), at 8.) The same theme also had been sounded during the tenure of the preceding Democratic chief executive. Indeed, conversations between the outgoing and incoming executive staffs included discussions to the effect that governmental efficiency could be enhanced and costs could be reduced by eliminating, among many others, various public relations and policy positions and by consolidating those functions in the offices of the several cabinet secretaries.

In pursuit of these efficiency and cost reduction measures, the Governor's Chief of Staff, Jay Timmons, issued a directive late in the spring of 1994 to all cabinet secretaries "to initiate a review of the agencies to look at opportunities for elimination of positions that were duplicative or unnecessary." (*Id.*, Ex. 8 (Skunda Dep.), at 77–78.) As discussed during the transition of executive staffs, that directive specifically instructed the cabinet secretaries to consider elimination of positions in "communications, public affairs[,] . . . policy and constituent affairs as well as personnel, human resources, . . . finance, financial oversight of management functions and other things which the agency heads were expected to have personal oversight and accountability for." (*Id.*)

In early June 1994, each cabinet secretary was requested to complete by June 28, 1994, a review of agencies within his or her secretariat for the foregoing purposes. If, as a result of that review, an agency head determined that a particular position was either duplicative or unnecessary, the position was targeted for abolition. (*See* Thomas Affidavit, ¶ 7 (accompanying Defendants' Motion for Summary Judgment).) After receiving recommendations from agency heads within the secretariat, each cabinet secretary, working with the Department of Planning and Budget, calculated the savings expected to be achieved from eliminating all targeted positions. (*Id.*, ¶ 8.) That process culminated at the end of June 1994, and it produced the personnel actions which gave rise to this litigation.

More particularly, this litigation focuses on the actions within the Department of Labor and Industry ("DLI"), the department in which Mandel worked, and within the Department of Rehabilitative Services ("DRS"), the department employing the other three plaintiffs, Crawford, Spencer, and Bennett. It is necessary, therefore, to examine the personnel actions taken in those departments as to these plaintiffs.

### 1. *Plaintiff Mandel and the Department of Labor and Industry*

In May 1985, the position of Labor and Industrial Planning Manager was established within DLI. At that time, the reporting line required the holder of this position to report directly to an agency head. Consequently, the occupant of this position was exempt from the VPA. Mandel was hired to fill the position on August 6, 1985 at a salary grade of 14. (Bell Affidavit, ¶ 10 and Ex. E (accompanying Defendants' Motion for Summary Judgment).)

On July 25, 1986, the reporting line for the position was changed so that Mandel reported to an Assistant Commissioner of Labor within DLI rather than directly to the Commissioner of Labor, the agency head. Mandel thereupon became a classified employee because she did not report directly to an agency head and she fell within a salary grade less than 16. Thus, this unilateral personnel decision changed Mandel's status from exempt to classified.

Theron J. Bell, a defendant, became Commissioner of DLI on May 23, 1994. As head

of the agency, Bell reported directly to Robert T. Skunda, another defendant and the Secretary of Commerce and Trade. As part of the effort to restructure state government, Bell was directed to review the programs and organizational structure within DLI and to identify changes which he thought would streamline DLI and make it more efficient and responsible. (Bell Affidavit, ¶¶ 1, 3.) On May 31, the Assistant Commissioner for Training and Public Services tendered a letter of resignation to take effect on July 1.

On June 23, Bell submitted a proposed plan to restructure DLI "to improve the efficiency and effectiveness of delivery of services to the public." (*Id.,* ¶ 5 and Ex. A.) The restructuring plan proposed to abolish the position of Assistant Commissioner for Training and Public Services and to require the five program managers, including Mandel, who then reported to the departing Assistant Commissioner, to report directly to the Commissioner.

Bell had informed Mandel and the other program managers of this decision on June 14; however, the formal plan was not submitted or approved until June 23. (*Id.*) Implementation of the plan was underway by June 28. (*Id.,* ¶¶ 4, 5.) On that day, Bell again met with Mandel and the other program managers. During this meeting, Bell informed them that the new agency structure had been approved and asked them to acknowledge in writing that they understood the position descriptions and the change in the reporting relationship. Mandel so acknowledged. (*Id.,* ¶ 7 and Ex. B.)

Approximately one month later, on July 26, upon finding that Mandel's position was duplicative, Bell abolished it.[1] Two additional positions, Public Relations Manager and Public Relations Specialist, were abolished on the same day, to take effect on August 16. Mandel was informed of this decision on July 27, verbally and by letter. (Bell Affidavit, ¶ 8 and Ex. C.) Mandel did not file a grievance of the decision which changed her reporting line and hence her classified status. Nor did she initiate a grievance as to the

decision to abolish her position. Bell avers that he attempted to identify another position within DLI into which Mandel could transfer, (*id.*), but was unable to do so.

2. *Plaintiffs Spencer, Bennett, and Crawford and the Department of Rehabilitative Services*

Ronald C. Gordon, a defendant, became the Commissioner of DRS on June 16, 1994. Before his term began, the Secretary of Health and Human Resources, Kay Cole James, stressed to Gordon the goal of eliminating unnecessary and duplicative positions within DRS. (Gordon Affidavit, ¶ 3 (accompanying Defendants' Motion for Summary Judgment).) On July 20, Gordon submitted his plan to abolish unnecessary positions and to reorganize DRS. This plan was a revision of a plan that Gordon had first submitted on June 23. Under the revised plan, the positions of Bennett and Spencer (both of which involved supervising a small number of professionals) were included in the list of positions to be abolished as unnecessary. James approved all position abolitions proposed by Gordon's plan. (*Id.,* ¶¶ 4, 5.)

Because both Bennett and Spencer were classified employees, DRS undertook to afford them the rights prescribed by the layoff provisions of the Personnel Manual. However, there were no other positions available for either employee in August, immediately after their jobs were abolished on July 28. Bennett and Spencer filed grievances with DERC on September 6 and 16, respectively. (*See id.,* Exs. H, I.)

While those grievances were pending, DPT identified to Gordon a position which, in August, Gordon had contemplated would be integrated into another position and thus would not be a vacancy available to Bennett or Spencer. In October, however, Gordon decided that the position constituted a valid vacancy which should be filled by a laid-off employee. Because Ray Graesser, who is not a party to this action, had greater seniority than either Bennett or Spencer, Graesser

---

**1.** Mandel's position had been targeted for elimination by the previous Commissioner of DLI in 1993, as well. (*See* Bell Affidavit, ¶ 9.)

was offered the position, and he accepted it. (Gordon Affidavit, ¶ 8.)

In letter opinions considering all of these facts and dated November 15 and November 16, 1994, respectively, DERC Director Phyllis C. Katz determined that the claims of both Bennett and Spencer were not grievable. Katz found specifically that their positions had been abolished solely for efficiency reasons and that all layoff procedures had been properly followed. Both letters explained that the "nongrievable ruling applies only to the management steps of the grievance procedure and in no way affects your right to appeal this decision to your agency head by requesting qualification for a panel hearing." (*See id.*, Exs. H, I.) Neither Bennett nor Spencer appealed.

Robert F. Crawford has worked for the state since 1987. In 1994, he was a Computer Systems Engineer (supervised by Bennett until her position was abolished). On August 10, 1994, Gordon informed Crawford that he would now report directly to the agency head. This meant that Crawford was no longer protected by the VPA. About thirty days later, and around the time that this action commenced, Gordon retracted that position as erroneous, informing Crawford that "[t]he Secretary of HHS never approved a '776' designation for Mr. Crawford" and that "all reference to a '776' status would be removed from his personnel file." (Gordon Affidavit, ¶ 9.) Gordon also avers that "Crawford has been in active service continuously from 1987 through the present and has been covered by the Virginia Personnel Act for that entire period." (*Id.*) Crawford never filed a grievance complaining of Gordon's error in August.

## DISCUSSION

### A. The Parties' Theories

The briefs filed by the plaintiffs are laden with postulations of general constitutional principles, and their arguments are somewhat confusing because of the efforts to amalgamate those general principles into a theory which might permit a recovery. After parsing the pleadings and the briefs, it appears to the court that the plaintiffs' claims are premised principally on the theory that state employees have a property interest in their status as classified employees, and in two incidents of that status: the grievance procedure created by the VPA and the layoff rights established by the Personnel Manual. According to the plaintiffs, the personnel actions described above deprived them of those property rights in violation of the due process clauses of the federal and state constitutions.

The plaintiffs find support for these theories in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); and *Detweiler v. Commonwealth of Va. Dept. of Rehab. Services*, 705 F.2d 557 (4th Cir.1983). And, in an odd twist on procedural due process law, the plaintiffs summarize the cases thusly: "Under the rules of [*Loudermill*] and [*Detweiler*], a nonprobationary employee may not be deprived of his or her classified status without due process of law *absent a compelling state need*." (Plaintiffs' Memorandum in Support of Their Motion, at 11 (emphasis added).)

Applying this theory, Crawford claims that he could not be "de-classified," even only temporarily and by mistake, without a hearing; Mandel claims that her reporting line could not be changed to de-classify her, nor could her job be abolished, without a hearing; and Bennett and Spencer claim that their jobs could not be abolished and that the layoff procedure could not be followed concerning them without some sort of hearing in which they received an explanation of how the layoff procedure was being applied and in which they were allowed an opportunity to correct mistakes on the application of the procedure. (*See* Plaintiffs' Reply Memorandum, at 24–25.)

In a related argument, the plaintiffs invoke the Takings Clause of the Fifth Amendment, in support of which they cite *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Lucas v. South Carolina Coastal Council*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); and *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). This clause, they claim,

864

requires the state to provide them with just compensation for depriving them of their classified status.

The second basis for the plaintiffs' claims is the theory that certain of their substantive employment rights were withdrawn by the retroactive application of legislation, in violation of Virginia Code § 1–16 and Article I, §§ 9 and 11 of the Virginia Constitution. They rely primarily upon *City of Norfolk v. Kohler*, 234 Va. 341, 362 S.E.2d 894 (1987), for statutory protection; and *School Bd. of Norfolk v. U.S. Gypsum Co.*, 234 Va. 32, 360 S.E.2d 325 (1987), and *Starnes v. Cayouette*, 244 Va. 202, 419 S.E.2d 669 (1992), for constitutional protection. As the court understands the argument, the defendants allegedly withdrew the plaintiffs' substantive employment rights through the retroactive application of law by changing Mandel's classification and abolishing certain positions after the 1994 amendments to the VPA (reflected in H.B. 776) took effect.

As the plaintiffs see it, these questions are ones of law, as to which they are entitled to summary judgment, leaving only the nature of the remedy for further proceedings. Defendants acknowledge that the plaintiffs' theories of liability are matters of law, but they contest the validity of the theories and they too have moved for summary judgment.

Defendants agree that, around the beginning of the summer of 1994, all four plaintiffs had a property interest in continued employment, which included access to the grievance procedure and to layoff rights. They deny, however, that the plaintiffs had a property interest in the continued existence of their positions or in classified status, which existed only as an incident of their reporting lines. The defendants argue, instead, that the executive branch had the power and discretion to abolish jobs and alter reporting lines for efficiency reasons. And, they assert that, because Plaintiffs can point to no evidence that systemic concerns are merely a pretextual justification for the personnel decisions at issue, the defendants are entitled to judgment as a matter of law.

Under the defendants' theory, the question of whether due process was given is never reached because no deprivation of property ever occurred. Thus, they say that Crawford suffered no deprivation by mistakenly being told he was exempt; that Bennett and Spencer were not deprived of their layoff rights, notwithstanding that the exercise of those rights happened to be unfruitful; that Bennett and Spencer were also not deprived of their property rights when their jobs were abolished because the extent of their property rights did not include an interest in a job which could not be eliminated; and that, for the same reason, Mandel was deprived of no property right when her job was reclassified by virtue of a change in her reporting line.

Defendants only briefly refute the retroactive-application argument. They argue that no vested rights were removed by legislation enacted after the vesting. That is, the same personnel decisions could have been made concerning Mandel, Bennett, and Spencer before the 1994 amendments to the VPA were enacted as were actually made after the amendments were enacted and became effective.[2]

## B. Standard for Summary Judgment

Summary judgment is appropriate only when there is no issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A moving party is entitled to summary judgment if the nonmovant fails to provide sufficient support on an essential element of the case for which it has the burden of proof. *See Houchens v. American Home Assurance Co.*, 927 F.2d 163, 165 (4th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). The evidence should be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Moreover, summary judgment is not appropriate "even where there is no dispute as to the evidentiary facts but only as to the

**2.** Defendants also raise the shield of legislative immunity and qualified immunity. Plaintiffs devote much of their briefs to refuting those defens-

es. There is, however, no need to address the immunity issues.

conclusions to be drawn therefrom." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). Still, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion and of establishing the lack of a genuine issue of material fact by pointing to relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any.'" *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Then, the burden of production, but not persuasion, shifts to the non-movant. The non-movant must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e). With this standard in mind, the court analyzes first the relevant law as it relates to the parties' legal theories and then the specific allegations of all four plaintiffs.

## C. Due Process and Public Employment Law

Resolution of the summary judgment motions is found in decisions issued over the past two decades by the Supreme Court and the Fourth Circuit which define the rights of public employees in the context of the Fourteenth Amendment. It is to this body of law that the court now turns.

Under the Due Process Clause of both the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the Virginia Constitution, the procedural, as opposed to the substantive, due process guarantee exists "to provide procedural safeguards against a government's arbitrary deprivation of certain interests." *Etheridge v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525, 530 (1989); *see Leis v. Flynt,* 439 U.S. 438, 441, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) (noting that the Due Process Clause "extends various procedural safeguards to certain interests 'that stem from an independent

source such as state law'"). At base, the plaintiffs' claim is simply that they were deprived of property interests in their employment with the State of Virginia by the arbitrary action of the defendants.

### 1. The Property Interest

■ The threshold issue then is to determine the property interest in state employment. In a line of cases beginning with *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court has recognized that a state may, through its statutes, rules, and other means, give state employees a property interest in continued employment. The property interest arises when state law creates for an employee a "legitimate claim of entitlement" to certain benefits of employment, and this is a question of federal constitutional law. *See Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). The scope of this property interest (that is, the number and sort of benefits) depends upon the state law creating the claim of entitlement, but the federal Constitution protects against the arbitrary deprivation of benefits that fall within the scope of the property interest conferred by state law. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) ("Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'") (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). The property interest, of course, may extend to rights that are incident to employment. *See, e.g., Hairston v. District of Columbia,* 638 F.Supp. 198, 202 (D.D.C.1986) (noting that "the District of Columbia's statutory administrative sick leave scheme has been found to create a property interest in the continued receipt of administrative sick leave").

### 2. Deprivation of Property

If the court finds a property interest, it must next determine whether an employee has been deprived of this interest in a significant way. *See Paul v. Davis,* 424 U.S. 693,

710–11, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976) (noting that "the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter [state-law-]protected status"); *Fuentes v. Shevin,* 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972); *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 787, 28 L.Ed.2d 113 (1971).

The precise scope of the property interest is important in answering this question. For example, where a public employee has a property interest in continued employment, the employee is not deprived of this interest where his or her position is abolished because state laws creating the property interest, while usually giving rise to a legitimate expectation that disciplinary termination may not occur without adequate procedures, do not create a legitimate expectation that the employee's position will never be abolished. Job abolition, however, may not be cited as a pretext for avoiding an employee's right to due process when a termination is actually for disciplinary reasons. *See Duffy v. Sarault,* 892 F.2d 139, 147 (1st Cir.1989) (holding that terminated employees were not entitled to due process where their jobs were abolished as part of a "valid reorganization"); *Misek v. City of Chicago,* 783 F.2d 98, 100–01 (7th Cir.1986) (reversing the lower court's dismissal of the complaint of public employees who alleged that the reorganization "exception" to their due process rights did not apply as no reorganization actually occurred); *Digiacinto v. Harford Co., Md.,* 818 F.Supp. 903, 905–06 (D.Md.1993) (finding insufficient evidence to rebut the "well established" reorganization defense by showing "that the reorganization was not carried out in good faith and was merely a subterfuge"); *Christian v. Cecil Co., Md.,* 817 F.Supp. 1279, 1284–85 (D.Md.1993) (finding abundant evidence to support plaintiffs' claim that "they were terminated for personal reasons rather than due to a legitimate governmental reorganization"); *Mermelstein v. Haner,* 436 F.Supp. 238, 241 (W.D.Va.1977), *aff'd,* 588 F.2d 1350 (4th Cir.1978) (upholding the abolition of classified positions resulting from budget cutbacks); *Hartman v. City of Providence,* 636 F.Supp. 1395, 1410 (D.R.I.1986) (collecting state and federal cases which recognize that no hearing is required, "despite the presence of a 'no dismissal except for cause' rule, when a position is abolished pursuant to a bona fide government reorganization or kindred cost-cutting measure").

This rule strikes a fair balance because it "preserves to government the right flexibly to address systemic needs while preserving to the employee meaningful protection against job actions directed specifically against him or her." *Hartman,* 636 F.Supp. at 1410. "The reason for this rule is quite simple: if an employee is losing her job not because of allegedly deficient performance but for extraneous reasons relating to fiscal and operational concerns, a hearing regarding the quality of the employee's performance would serve no useful purpose." *Digiacinto,* 818 F.Supp. at 906.

The law is well-established that " '[t]he power to create an office generally includes the power to modify or abolish it.' " *Goldsmith v. Mayor & City Council of Baltimore,* 845 F.2d 61, 65 n. 2 (4th Cir.1988) (quoting 63A Am.Jur.2d *Public Officers and Employees* § 31 (1984)). Even a classified employee cannot legitimately expect that his or her position will never be abolished because

> [p]ublic offices are created to meet the needs of the people, and when such need ceases to exist, there is no obligation or necessity to continue a useless office. The determination that a position should be abolished for reasons of efficiency and economy is solely within the judgment and discretion of the governing authority in whom the power to eliminate the office is vested.

*Id.* There is no dispute here that the proper governing authorities (in the executive branch) decided which positions to abolish. *See* Va.Code § 2.1–20.01. And, although the governing body in *Goldsmith* came from the legislative branch, the same principle applies to executive branch agencies that have the power to create and abolish positions.

The Fourth Circuit decision on which Plaintiffs rely is entirely consistent with this principle. Indeed, in *Detweiler,* the Fourth Circuit, when describing the extent of the property interest of a classified employee in

Virginia, maintained a distinction between discharges for cause and discharges "because of lack of work, reduction in work force, or job abolition," finding that only discharges for cause require due process. *See Detweiler*, 705 F.2d at 559–60 & n. 2 (citing Va.Code § 2.1–114.5:1(B)(vi)).

### 3. *Due Process: Process Is Not Property*

■ If a deprivation of property has occurred, the court must finally determine whether the deprivation occurred without due process of law. The process that is due is not necessarily the process provided by state law. Instead, the procedures must meet a standard defined by federal constitutional requirements. *See Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1492–93.

■ Although the plaintiffs argue otherwise, the procedures established by the state to safeguard the property interest are not property and, therefore, do not define the nature or scope of the property interest to which the procedural due process guarantee attaches. *See Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1493 (" 'Property' cannot be defined by the procedures provided for its deprivation...."); *Brandon v. District of Columbia Bd. of Parole*, 823 F.2d 644, 649 (D.C.Cir.1987) (refusing to "equate the process due with the substantive interest" and noting that otherwise, "there would be a constitutional due process right to have states adhere to any procedural rules promulgated by them"); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 (11th Cir. 1987) (refusing to equate a "violation of a state statute outlining procedure" with a due process violation and noting that "otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes"); *Rogers v. Okin*, 738 F.2d 1, 5 n. 4 (1st Cir.1984) ("Where substantive rights and procedural protections under state law exceed the minima required by the federal due process clause, actions that violate state law may nonetheless satisfy the requirements of federal due process."); *Lyon v. Farrier*, 727 F.2d 766, 768 (8th Cir.), *cert. denied*, 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed.2d 79 (1984) (stating that "[p]rocess is not an end in itself," but a means "to protect a substantive interest"). Thus, a state employee has no property interest in receiving the precise procedure provided by state law.

To support their view to the contrary, Plaintiffs cite language from *Himmelbrand v. Harrison*, 484 F.Supp. 803, 808 (W.D.Va. 1980): "[W]here a public employee can show that when he was discharged, 'he was denied the benefit of local procedural and personnel rules which would have served to protect his employment status,' such public employee demonstrates a legitimate property interest which merits constitutional protection." (*See* Plaintiffs' Memorandum in Support of Their Motion, at 28.) Even assuming that language was meant to be interpreted as Plaintiffs suggest, it lost its force with the Supreme Court's decision in *Loudermill* five years later.

In the paragraph following the language on which the plaintiffs rely, the *Himmelbrand* court explained that its decision was predicated on the concept that Himmelbrand had a right to expect the protection of certain statutory "Procedural Guarantees"; that the statutory procedure "gives Virginia's policemen a 'legitimate claim of entitlement to continued employment' *at least to the extent that it furnishes insurance against arbitrary employment actions*"; and that "[t]he Due Process clause of the fourteenth amendment, therefore, became implicated if, as a factual matter, [the plaintiff] was deprived of the benefits conferred by" the statutorily-provided procedure. *Himmelbrand*, 484 F.Supp. at 808 (emphasis added). *Loudermill* clearly rejected such "bitter with the sweet" reasoning, however. *See Loudermill*, 470 U.S. at 540, 105 S.Ct. at 1492 (rejecting the reasoning of the plurality in *Arnett v. Kennedy*, 416 U.S. 134, 152–54, 94 S.Ct. 1633, 1643–44, 40 L.Ed.2d 15 (1974), that "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet").

Plaintiffs also argue that it follows from *Detweiler*, 705 F.2d at 559, that Virginia's grievance procedures are constitutionally protected property interests. (*See* Plaintiffs' Memorandum in Support of Their Motion, at

26, 27.) This argument stretches *Detweiler* too far because there, the Fourth Circuit looked to the grievance procedure only to help "establish that a nonprobationary employee has a property interest *in continued employment.*" *Detweiler,* 705 F.2d at 559–60 (emphasis added).

## D. Public Employment Law Applied to Virginia's Personnel Scheme

Clearly, as in *Detweiler,* 705 F.2d at 559–60, it is still true that Virginia's statutes and regulations establish that "a nonprobationary employee does not serve at the will of the agency that employs him," and that "a nonprobationary employee has a property interest in continued employment that is created by the state." The scope of this interest, however, is also still circumscribed by Virginia's rules on exemptions from the classified employment scheme and from access to the grievance procedure and by Virginia's layoff-rights scheme.

### 1. *Changes in Reporting Lines*

The VPA defines the scope of an employee's interest in retention of classified status and in changes respecting reporting lines. In that regard, the statute provides that "[e]ach Governor's Secretary shall have final authority in determining on an ongoing basis the officers and employees exempted by [virtue of reporting to an agency head]. Such officers or employees shall thereafter serve at the pleasure and will of their appointing authority." Va.Code § 2.1–116(A). Under this provision of the VPA, each Secretary is authorized at any time to change the reporting line of a classified employee. This statutory reservation of management rights, and its consequent limitations on employee expectations, is confirmed by the grievance provisions of the VPA which, *inter alia,* provide:

> Management reserves the exclusive right to manage the affairs and operations of state government. Accordingly, the following complaints are nongrievable: (i) establishment and revision of ... position classifications ... [and] (vii) the ... trans-

fer [or] assignment of employers within the agency.

Va.Code § 2.1–114.5:1 B.

These statutory provisions make clear that, under the VPA, Virginia may choose, for example, to increase the accountability of a position by changing its reporting line or more effectively to use an employee's skills by promoting him or her to a position that reports directly to an agency head. In all of these possible decisions, of course, just as the state may not discriminate because of an employee's race or political affiliation, it may not choose an option simply to circumvent an employee's due process rights. *Cf. Duffy,* 892 F.2d at 147; *Misek,* 783 F.2d at 100–01 (requiring *bona fide* reorganizations to avoid property rights deprivations).

Plaintiffs have suggested that judicial confirmation of this authority could render the protections of the VPA a nullity. That is, any Virginia employee, apparently protected by the VPA on Monday, could be told to report to an agency head on Tuesday and fired without due process on Wednesday. This suggestion is of no force where, as here, the plaintiffs have attacked not the statute, but the action taken pursuant to it. Such hypotheticals, moreover, present no reason to invalidate the statutory grant of authority altogether. The more appropriate course, drawing from *Duffy, Misek,* and the other cases concerning job abolitions and reorganizations, is to presume that a change in an employee's reporting line occurs for legitimate systemic reasons absent a showing of pretext by the employee.

### 2. *Job Abolitions*

The grievance provisions of the VPA also circumscribe the scope of the state-created property interests in public employment. Those provisions limit an employee's legitimate expectations in the continued existence of his or her job. This is because the VPA provides that an employee may not grieve "termination, layoff, demotion or suspension from duties because of lack of work, reduction in work force, or job abolition." Virginia Code § 2.1–114.5:1B. Obviously, given the logic of *Loudermill,* the extent to which the state affords a grievance process does not

define the process that is due constitutionally, but it is still probative, as in *Detweiler*, of whether a particular employee even possesses a property interest in continued employment. *See Detweiler*, 705 F.2d at 559–60 (adhering to the rule that federal law defines due process but, at the same time, citing the grievance procedure to support the existence of "a property interest in continued employment"); *id.* at 559 n. 2. And, even without this express reservation of the state's right to abolish positions, the legitimate expectations created by a "no dismissal except for cause" personnel scheme such as Virginia's only extend to due process for disciplinary dismissals. *See Christian*, 817 F.Supp. at 1284 (stating that in cases of "legitimate governmental reorganization or budgetary cutbacks," "government employees 'enjoy no comparable property interest in [ ] employment ... but only an abstract desire to retain the job and a unilateral expectation of keeping it in the face of enforced budget cuts'") (quoting *Hartman*, 636 F.Supp. at 1416) (alterations in original).

### 3. *Layoff Rights*

■ Unlike many of the state laws at issue in other due process employment cases, Virginia's employment scheme retains for classified employees layoff rights that continue even after a position is legitimately abolished. Although apparently no case has yet addressed the specific subject, the parties do not dispute that layoff rights rise to the level of property rights.

In determining whether these asserted property rights actually exist and the scope of any such rights, the court must consider (1) the "nature" of the plaintiff's interest in having the state adhere to the layoff policy and (2) the extent to which promulgated rules lead to a legitimate expectation that the interest will be respected. *See Roth*, 408 U.S. at 571, 577, 92 S.Ct. at 2706, 2709. Both considerations here weigh in favor of a property interest. The affected employee's underlying interest remains continued employment, just as it is in the more straightforward *Loudermill* context. Thus, when a laid-off employee is not given a job that is available under Virginia's layoff policy, that

employee is deprived of a property interest. On the other hand, contrary to Plaintiffs' argument, if a mistake is made in analyzing the employee's employment opportunities, but the mistake does not result in the failure to offer a job that should have been offered, then no deprivation of property occurs because the mistake does not affect the property interest in continued employment.

As discussed in the Statement of Facts, *supra*, the plaintiffs highlight two layoff policies, Policies 1.30(III)(A) and (C), that could, under certain circumstances, (a) proscribe abolition of an employee's position, or (b) require that an employee be reassigned following abolition of his position, respectively. Thus, in the case of a layoff, the predicate for a deprivation of property is (a) that another position should have been abolished instead of the plaintiff's, or (b) that another position is available into which the plaintiff should have been "bumped." For these are the facts which would show that the plaintiff has been deprived of employment to which he or she is entitled; only then would due process be required to adjudicate the existence of cause for being deprived of the property right in continued employment.

Because the plaintiff has the burden to prove deprivation of an asserted right, he or she must establish one of these two predicates. *See Lamoureux v. Haight*, 648 F.Supp. 1169, 1173 (D.Mass.1986) (finding that disability benefits were not an entitlement or a property right unless an injury was work related and that the plaintiff failed to allege sufficient facts to establish a work-related injury and a property interest deprivation); *Hairston v. District of Columbia*, 638 F.Supp. 198, 202–03 (D.D.C.1986). In *Hairston*, the District of Columbia's statutory administrative sick leave scheme had already been found "to create a property interest in the continued receipt of administrative sick leave," but such leave was conditioned on a duty-related illness. *Id.* at 202. Rejecting the plaintiff's claim that the denial of sick leave deprived him of property, the court reasoned, "When a benefit is conditional, and the claimant has not shown that the factual predicates to its receipt exist, his claim does not ripen into a 'legitimate entitlement' to

property under the Constitution." *Id.* One who claims a right to hold a position pursuant to Virginia's layoff policy, then, must show the factual predicates establishing the entitlement.

These then are the basic principles which must be applied to measure the different claims made by Mandel, Bennett, Spencer and Crawford. Before undertaking that assessment, however, it is first necessary to clarify some confusion implicit in Plaintiffs' constitutional analyses and to dispose of three clearly erroneous arguments.

### E. Flaws with the Plaintiffs' Analyses

#### 1. *Substantive Versus Procedural Due Process*

The plaintiffs argue that the Virginia Due Process Clause is different than its federal companion, suggesting that "substantive rights—as defined by the Virginia Supreme Court—are [not] identical to constitutionally protected property interests as defined by the federal courts." (Plaintiffs' Supplemental Memorandum, at 3.) To establish the difference between their federal and state due process rights, the plaintiffs point to two Virginia decisions applying state *substantive* due process guarantees: *School Bd. of Norfolk v. U.S. Gypsum Co.*, 234 Va. 32, 360 S.E.2d 325 (1987) (holding that, notwithstanding some federal decisional law to the contrary, a state statute of repose gave a defendant a substantive right that could not be legislatively eliminated consistently with the Virginia Due Process Clause); and *Starnes v. Cayouette*, 244 Va. 202, 419 S.E.2d 669 (1992) (extending the holding of *U.S. Gypsum* to a defendant's rights given by a state statute of limitations but later legislatively withdrawn). Unlike the guarantee of procedural due process, however, "substantive due process tests the reasonableness of a statute vis-a-vis the legislative's power to enact the law." *Etheridge*, 376 S.E.2d at 530.

Although *U.S. Gypsum* and *Starnes* might suggest a difference in the kind of analyses applicable to federal and Virginia substantive due process claims, nothing in either decision would permit the plaintiffs to assert a claim

for infringement of procedural due process under the Virginia Constitution that is different than the procedural due process claims permitted by the federal Constitution. And, because both cases invalidated retroactive legislation, neither case is applicable here, unless the plaintiffs' retroactivity argument has some merit.

#### 2. *The Retroactivity Argument*

Plaintiffs argue that the personnel decisions of which they complain were the result of the application to them of § 2.1–116(A)(16), as amended by H.B. 776 effective July 1, 1994. This, they say, is a retroactive denial of their vested property rights. However, the VPA, as it affects the rights of the plaintiffs on the facts here presented, has been the same since 1985. Both before and after the 1994 amendment (H.B. 776), the statute exempted "employees of executive branch agencies ... who report directly to the agency head." Omitted from the amended version is the additional exemption for "those at the level immediately below those who report directly to the agency head and are at a salary grade of sixteen or higher." This did not affect any of the plaintiffs; and if it had, H.B. 776 would have only benefitted them by bringing them within the protection of the VPA.

Because the new legislation did not affect the plaintiffs' rights, they do not stand in the same position as the plaintiff in *City of Norfolk v. Kohler*, 234 Va. 341, 362 S.E.2d 894 (1987). There, the plaintiff had a legitimate expectation, grounded in the city charter, that she would not be discharged except for cause and after an opportunity to be heard. *Id.* at 896. The city passed a new law withdrawing her classified status. *Id.* at 895. Obviously, that new law directly affected the plaintiff in *Kohler* because she would have been classified but for the new legislation. That is simply not what happened here.

Plaintiffs are also in a substantially different position from the plaintiffs in *Starnes* and *U.S. Gypsum*. In both cases, the defendants had vested rights to be free from suit by operation of a Virginia statute of repose or limitations. After these rights had vested, a new law was enacted that would have with-

drawn this protection. The Supreme Court of Virginia found that the Virginia Due Process Clause precluded this retroactive application of the new limitations period. Nothing remotely like that occurred in the personnel decisions at issue in this action.

Although the plaintiffs have been alerted by the court that H.B. 776 did not affect any of them, Plaintiffs inexplicably have continued to press the theory that that amendment was applied to them retroactively. A comparison of § 2.1–116(A)(16) as it existed on June 30, 1994 to that section as it existed on July 1, 1994, the effective date of the H.B. 776 amendments, clearly shows that there is no difference that would have avoided the predicament in which the plaintiffs find themselves today. Because nothing in H.B. 776 altered the scope of the property interests, their argument that the law was retroactively applied to them is meritless.

Indeed, the only conceivable claim of that ilk appears in Mandel's assertion that the change in her reporting line constitutes a retroactive application of law. The fact remains, however, that a Virginia employee has been subject to such a change in status under § 2.1–116(A)(16) since 1985, before Mandel was hired. By exercising a prerogative that has existed since that time, an agency head cannot be said to have retroactively applied some new law.

### 3. The Perceived Need for a Compelling State Interest Analysis

Under its procedural guarantees, "the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). Plaintiffs would supplement this guarantee, although it would seem to increase their burden, by invoking a new rule that "a nonprobationary employee may not be deprived of his or her classified status without due process of law *absent a compelling state need.*" (Plaintiffs' Memorandum in Support of Their Motion, at 11 (emphasis added).) This is simply not correct.

When a law "impinge[s] upon constitutionally protected rights," compelling state interests sometimes play a role as part of the strict scrutiny test. *See San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 11.7, at 388 (noting that the Supreme Court has applied a strict form of review under due process and equal protection challenges to "governmental actions which limit the exercise of 'fundamental' constitutional rights"). This approach has never been used, however, to allow deprivations of property without due process. *Loudermill* and the other public employment cases do not suggest that, in the presence of a compelling state interest, a property right in continued employment can be deprived without adequate procedures, and it is unclear why Plaintiffs would urge this interpretation.

The confusion concerning the role of the state's interest may have arisen because the state's interest is indeed relevant in determining, once a property deprivation is shown, what process is due process. *See Goldberg v. Kelly,* 397 U.S. 254, 262–63, 90 S.Ct. 1011, 1017–18, 25 L.Ed.2d 287 (1970) ("The extent to which procedural due process must be afforded the [welfare] recipient ... depends upon whether the recipient's interest in avoiding [grievous] loss outweighs the governmental interest in summary adjudication."); NOWAK & ROTUNDA, *supra,* § 11.7, at 393 (noting that one right which has been recognized as "fundamental," and thus implicating compelling-interest analysis, is the right to fairness in due process procedures). More to the point, the Supreme Court has pointed out an error in the reasoning of a federal district court which is similar to that here advanced by the plaintiffs. *See Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972) (describing how the district court had erred when it balanced interests in order to determine whether due process guarantees applied, but noting that weighing interests "has long been a part of any determination of the *form* of hearing required").

## F. Disposition of the Individual Claims

As explained earlier, the specific employment decisions taken with respect to Crawford and Mandel differed from those taken as to Bennett and Spencer. Accordingly, it is necessary now to apply the controlling legal principles to the claims of the individual plaintiffs.

### 1. *Robert F. Crawford*

■ Crawford has no due process claim for several reasons, foremost of which is his failure to demonstrate any deprivation of property. His property interest in continued employment was never disturbed; and, indeed, he remains employed to this day. Even had the Secretary of HHS approved the "776" (exempt) designation for Crawford, his property interest, which is in continued employment, would have remained intact for as long as Crawford retained his employment.

Second, even if his property interest were in his classified status rather than in continued employment, the evidence fails to establish that he suffered any deprivation. Gordon may have notified Crawford that he no longer benefitted from classified status, but there is no evidence that Crawford was ever actually deprived of access to the grievance procedure or of any other benefits.

Yet another reason why Crawford's claim fails is the lack of a remediable injury. *Cf. Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995) (finding no "injury-in-fact" where an employer took "prompt and effective corrective measures to redress alleged incidents of racial harassment"). In Plaintiffs' Reply Memorandum, at 29, Crawford reduces the remedy he seeks to "such equitable remedies" as are required to prevent future involuntary re-designations. Absent a threat that rises above speculation, however, an injunction is inappropriate. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (finding that the "speculative nature" of a claim of future injury failed to fulfill "the prerequisite of equitable relief," which is a "real or immediate threat that the plaintiff will be wronged again"). The state has admitted its error, and Crawford has suffered no injury and is subject to no substantial threat of an injury.

### 2. *Barbara P. Bennett and Arthur R. Spencer*

■ Bennett and Spencer also suffered no deprivation of property. Their claim focuses on layoff rights, and they spell out in their pleadings the two layoff steps allegedly skipped by Defendants. "First, the identity of the person to be laid off must be determined by analysis of the status of persons [whether hourly or part-time or salaried] performing the function to be eliminated. . . . Defendants put forward no evidence that any such analysis was conducted before plaintiffs . . . were targeted for layoff." (Plaintiffs' Reply Memorandum, at 26.) This argument misses the mark because Bennett and Spencer, not the state, bear the burden of presenting some evidence that the layoff policy was violated in the fashion they have alleged. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."); *Lamoureux,* 648 F.Supp. at 1173; *Hairston,* 638 F.Supp. at 202 (noting that the plaintiff has the burden to show deprivation of a property interest). Neither Ms. Bennett nor Mr. Spencer has pointed to any other person performing their functions whose position should have been abolished first. Thus, the plaintiffs' conclusory argument, which lacks any evidentiary support, will not preclude summary judgment. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (requiring more than the "mere existence of *some* alleged factual dispute," but instead a *"genuine* issue of *material* fact") (emphasis in original).

· The second step that Bennett and Spencer cite is the "bumping" procedure, which, they say, "allows an employee whose position has been abolished to displace other employees at lower grades and with less seniority." (Plaintiffs' Reply Memorandum, at 26.) Again, Bennett and Spencer have pointed to no evidence in the record that they were deprived of this property interest. Indeed, all the evidence shows the lack of such a

displacement opportunity. (*See, e.g.,* Gordon Affidavit, Exs. H, I (DERC Director Katz explaining in letter opinions why she found no displacement options).) Because they have offered no evidence of any positions which the state was required to offer them under the layoff policy, Bennett and Spencer have failed as a matter of law to show that they were deprived of their interest in continued employment within the context of the layoff policy.

Even if they had made this showing, however, it appears that due process was given. Their positions were evaluated in detail by Katz and ruled nongrievable. Bennett and Spencer chose not to appeal these rulings.

### 3. *Marilyn Mandel*

■ Mandel's claims are substantially different than those asserted by Bennett and Spencer or by Crawford because she argues that she was deprived of her constitutionally protected status as a classified employee when her reporting line was changed.[3] The gravamen of this argument is that "she was summarily cut off from her grievance and layoff rights." (Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, at 15–16.) Then, "[w]hen her agency head abolished her position thirty days later, he did not accord Mandel her expectation in the order and manner of layoff." (*Id.* at 16.)

The principal problem with Mandel's theory is that she had no property right in the classified status on which she fastens her claim. Under the VPA, agency heads are given authority to decide the reporting lines of employees within the agency. Va.Code § 2.1–116(A). The exercise of that power to change reporting lines necessarily means that a redrawing of reporting lines can result in a change from classified status to exempt status. The establishment or revision of classifications are personnel decisions which are not grievable; and this policy stems from the deliberate decision to reserve solely to management the right to manage the affairs and operations of state government. Va. Code § 2.1–114.5:1B. Where, as here, the state statute vests the power to classify sole-

ly in management and then makes the exercise of that power non-grievable, there can be no property interest in the classification. In addition, as previously discussed, there can be no property interest in the procedures to which classified employees are entitled under state law.

Even if Mandel had retained her classified status after her reporting line changed, her claim would still fail. Like all of Virginia's classified public employees, Mandel had a property right in continued employment. *Detweiler v. Commonwealth of Va. Dept. of Rehab. Services,* 705 F.2d 557, 559–60 (4th Cir.1983). As explained above, when the state chooses to terminate an employee for cause, it may not avoid the requirements of procedural due process by merely citing job abolition as a pretextual justification. It is the employee's burden, however, to present evidence that the job abolition was a pretext for action intended to target the individual rather than the abolished position. Only then can there be a claim for deprivation of procedural due process. Mandel has not done that.

The undisputed factual record establishes that Bell was told by his superiors to identify positions which could be eliminated. At about the same time, the Assistant Commissioner, who was between Mandel and Bell (the agency head) in the reporting line, tendered his resignation. Bell decided not to replace him and directed Mandel and four other similarly situated employees to report directly to Bell. This decision necessarily resulted in reclassification of Mandel's position from classified to exempt. Nothing on the record even suggests that the decision by Bell was a pretext for converting a personnel action to which a due process right would have attached into one which did not enjoy that protection.

■ Confronted with this obvious impediment to her claim, Mandel seeks to devise pretext from the temporal relationship between the reclassification and the abolition of her job and from certain communications which occurred just before her job was abol-

---

3. Mandel is fond of referring to this event as her designation as a 776 employee. That, however, misdescribes what actually occurred. *See* Statement of Facts § A(1), *supra.*

ished. Specifically, Mandel finds it suspicious that her job was abolished thirty days after it was reclassified. That temporal connection does not permit a logical inference of pretext. This is particularly true where, as here, the reclassification has been shown to have been the product of an action by a third-party (the resignation of the Assistant Commissioner) at a time when, for considerations of economy and efficiency, the agency head was acting under directions to eliminate unnecessary positions. Furthermore, Mandel's position had been targeted for elimination under the previous administration's cost reduction and efficiency program. *See* Statement of Facts § B & n. 1, *supra.*

Nor do any statements by those within the administration establish that the classification decision or the job abolition was pretext. In that regard, Mandel points to communications which she interprets as evidence that high-level Virginia officials were consciously attempting to violate or avoid state employees' due process rights during the ongoing process of "downsizing." Whatever may be said of those communications, they refer to other issues and are of little, if any, probative value for any plaintiff's case. Considered in the light most favorable to the plaintiffs, the cited statements are insufficient to permit a jury to adopt their theory.

The evidence that Plaintiffs seem to rely upon most heavily is an E-mail memorandum from Frank Atkinson, Counsel to the Governor, to various Secretaries, dated June 21, 1994. (*See* Plaintiffs' Reply Memorandum, Ex. C.) The clear intent of the memorandum was to have the cabinet secretaries understand the changes that would be effected by H.B. 776 beginning July 1, 1994 and to "avoid the problem of vested rights." (*Id.*) That, however, does not help the plaintiffs because H.B. 776 eliminated the VPA's exemption of most of those positions "at the level immediately below those who report directly to the agency head and are at a salary grade of sixteen or higher." Those employees who met this description would become classified (and would thereupon have

"vested rights") on July 1, 1994.[4] None of the plaintiffs fits the description of an employee who was exempt before H.B. 776 and then would have become classified after it became effective. Thus, the plaintiffs' evidentiary centerpiece is simply not susceptible to the interpretation they urge the court to adopt: that it is evidence of pretext.

As further evidence of pretext, the plaintiffs refer to two other communications, both of which fail to advance their theories. First, the plaintiffs planned to introduce at trial "television interviews in which the Governor himself linked up the benefits of designating state employees as excluded from the [VPA] with the later elimination of their jobs." (Plaintiffs' Reply Memorandum, at 14–15.) Second, they offer the affidavit of C. Richard Cranwell, a member of the House of Delegates in the Virginia General Assembly: "At the time H.B. 776 was under consideration in the 1994 Session of the Virginia General Assembly, [Defendant] Michael Thomas assured me on behalf of the Executive Branch that, if passed, H.B. 776 would not be used to eliminate state government employees." (*Id.* at 15 & Supp.Ex. S.)

Of course, as was clarified in the discussion respecting retroactivity, H.B. 776 was not used to abolish any plaintiff's position. All of the personnel actions relevant to this case could have been taken before H.B. 776 was enacted. These very general statements do not permit a reasonable inference that the Governor or any other executive official was planning to intentionally avoid a classified employee's due process rights by changing her reporting line before terminating her services.

## CONCLUSION

The scope of Virginia's classified employees' property interest in continued employment is not infinite. If an employee enters a contract to work for the state for one year, subject to termination for cause, the employee cannot expect a guarantee of continued employment after that one-year period. In the same way, when the very statute that

---

4. Those rights would be the right to continued employment and the other rights attendant to classified status.

creates an employee's classified status in Virginia explicitly provides that the status depends on the employee's reporting line, which may be changed at any time, the employee cannot have a reasonable expectation that the classified status will remain forever unchanged. In like fashion, there also cannot be a reasonable expectation that a position will never be abolished for efficiency or other legitimate reasons.

The VPA affords state employees protection from being singled out for disciplinary dismissal, for example, without due process. But there is no evidence that any individual was singled out. Quite to the contrary, the evidence demonstrates that certain positions were targeted for elimination because of the state's perception of the value of the functions performed by those positions, without regard to the identity of the individual who occupied them and without consideration of how that individual had performed. Neither federal nor state law prohibits a state from a good faith effort to conduct its affairs more efficiently, and the state is not required to justify such efforts with proof that the efficiencies are working.

A state may not, of course, purport to eliminate a position for systemic reasons when it is actually targeting an individual or when it is seeking to use administrative efficiency as a pretext for avoiding procedural due process. To present sufficient evidence suggesting such a ruse is, however, a plaintiff's burden, and it has not been met here. The burden is not onerous, nor does it necessarily require a "smoking gun" memorandum or the like. It may not be satisfied by conjecture or surmise, however, and, upon analysis, that is the foundation of the pretext charge made here.

For the reasons set forth above, the plaintiffs' Motion for Partial Summary Judgment is denied, and the defendants' Motion for Summary Judgment is granted in its entirety. The action is dismissed with prejudice.

It is so ORDERED.